80 N.J. Super. 587 (1963)
194 A.2d 491
JACK FELBRANT, PLAINTIFF-APPELLANT,
v.
CHARLES B. ABLE, DEFENDANT-APPELLANT, AND SERVICE TRANSPORT COMPANY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 23, 1963.
Decided October 18, 1963.
*589 Before Judges GOLDMANN, KILKENNY and COLLESTER.
Mr. Allen Russ argued the cause for appellant Jack Felbrant.
Mr. Richard F. Connors argued the cause for appellant Charles B. Able (Messrs. Lieberman, Gorrin, Connors & Ironson, attorneys; Mr. Connors, of counsel and on the brief).
Mr. Edward C. Hillis argued the cause for respondent (Messrs. Marley, Winkelried & Hillis, attorneys; Mr. Hillis, of counsel).
The opinion of the court was delivered by KILKENNY, J.A.D.
In this personal injury negligence action, the Law Division granted the motion for summary judgment of defendant, Service Transport Company, (hereinafter "Service"), dismissing the action as to it, and denied defendant Able's motion for summary judgment, by which he sought an adjudication that Service, rather than he, was liable for the claims made by plaintiff. Plaintiff's claim against Able has not yet been tried.
Both plaintiff and defendant Able improperly filed notices of appeal from this interlocutory judgment, as though of right, without having the same made final by the trial court pursuant to R.R. 4:55-2 and without having first obtained leave to appeal. Petersen v. Falzarano, 6 N.J. 447, 453 (1951). However, on motion made at oral argument and with the consent of all parties, we granted leave to appeal nunc pro tunc.
*590 The facts are not in dispute, so far as they relate to the single issue of law involved in the respective motions for summary judgment. Accordingly, the motions were appropriately made. R.R. 4:58; Judson v. Peoples Bank & Trust Company of Westfield, 17 N.J. 67 (1954). The legal question involved herein is whether Service, a licensed I.C.C. carrier, having hired Able's tractor-trailer under a three-year written lease for use in its interstate commerce business, is vicariously liable, under the special facts and circumstances of this case, for the alleged negligence of Able, in driving his tractor-trailer into the rear of plaintiff's automobile at the time and place of the accident.
The lease agreement between Service, as carrier, and Able, as owner of the tractor-trailer being leased to Service, is dated April 1, 1960 and, among its other terms, provided that during the period of this lease the vehicles would be in the exclusive possession, use and control of the carrier who held the right to halt the movement of the vehicles; that the vehicles would display the legend that they were being operated under the lease, followed by the carrier's certificate or permit number; that such identification shall be completely removed from the vehicles when services for the carrier are completed under this lease; and that the contract had been entered into with a view to the satisfaction of all requirements of law, rules and regulations.
Service possessed a franchise issued by the Interstate Commerce Commission authorizing the shipment of freight in interstate commerce. It owned and operated several freight terminals, including those located in Norristown, Pennsylvania and Parma, Ohio.
On or about September 9, 1960 Able, pursuant to telephoned instructions from Service's dispatcher, picked up a load of freight at the Norristown terminal of Service and delivered it to Parma, Ohio. After completing this assignment, he received a further work assignment from Service's dispatcher in Ohio to transport a load of freight from Parma to the Port Newark terminal in Newark, New Jersey. He *591 completed this assignment, delivering the load at the Port Newark terminal.
Able then communicated with Service's dispatcher at the Norristown terminal for his further work assignment. This dispatcher advised Able that there were no further work assignments at that time. At the request of Able, Service's dispatcher at Norristown granted Able permission to be taken "off further service" in order to allow him to return directly to his home in Pottstown, Pennsylvania, about 20 miles from the Norristown terminal, so that Able could attend his ailing wife.
It was during this homeward trip on September 13, 1960, while Able was driving the empty truck along Route 1 in Elizabeth, New Jersey, that the collision with the rear of plaintiff's automobile occurred for which plaintiff instituted his civil action. At the time of the accident, the lease agreement between Service and Able was still in full force and effect, and, so far as we can gather from the record, Service's legend had not been removed from Able's vehicle.
The modus operandi under the leasing agreement between Able and Service was described in depositions. Thus, Frank Schlad, Service's vice-president in charge of safety and industrial relations, testified that the lease obligated Able to haul freight exclusively for Service, which had eleven terminals and whose licensed interstate commerce carrier business covered seven states, including Ohio, Pennsylvania and New Jersey. Service's I.C.C. registration number and Service's name, with its address as Cleveland, Ohio, were placed on Able's vehicle when the leasing agreement was entered into and, according to Schlad, were on Able's vehicle on the day of the accident that involved plaintiff, Felbrant. Schlad testified that this was so because, "It is a regulation of the Interstate Commerce Commission that the numbers must be displayed on the unit."
There is no evidence in the record that Able had removed from his tractor-trailer before this accident the legend showing Service's name, address and I.C.C. license or registration *592 number. Schlad testified that this legend was a sticky decal affixed to Able's vehicle which could not be removed manually in a practical way.
Schlad stated further that Able customarily reported to his "domicile terminal," which was in Norristown, Pa. because he lived in Pottstown, Pa. relatively nearby. He would there be given an assignment by Mr. Granese, the terminal manager. He also received work assignments at other terminals of Service, depending upon his availability for work in those other areas. Thus, if he were in Ohio, Able would call in to the nearest terminal and, as Schlad put it, "if there was no work for him, we would tell him there was no work available and normally the normal procedure is that they would request to be taken off, that they are going home." Schlad explained that, if this happened in Cleveland, Able could put himself off duty and be put back on the board for call. He could stay in that area or he could voluntarily return home to Pennsylvania for a further work assignment there.
Able received his work instructions either at some terminal area or, as Schlad testified, "he could be at home and called in." In the latter instance, he would drive his tractor-trailer from his home to the point of pickup, wherever it happened to be, and then proceed to the point of delivery. Service was paid by the shipper or consignee according to a schedule of rates covering the distance from point of pickup to point of delivery. Able received 73% of those charges collected by Service, such payment covering rental of the equipment and Able's compensation as driver.
Schlad further stated that, if there was no work for Able and he was in his "domicile area," the natural thing for him to do was to go home "just like any other worker would do after he finished his day's work." Port Newark was considered to be in Able's domicile area. On the other hand, Able could elect to wait at the terminal area until such time as he was dispatched out. If he elected to go home, he would then call the Norristown dispatcher from his home when he was ready for work and he would be put back in *593 service. In brief, there was no prohibition by Service against his going home. Schlad said that Able could go home any time he wanted to, if there was no work for him, so long as he called in and reported that that is what he wanted to do.
The position of Service is that, when Able requested to be placed out of service because he wanted to go home to his ailing wife and Service acceded to this request, Able's use of his equipment on the homeward trip was for personal transportation which had nothing to do with its business as an interstate commerce carrier. Based upon this premise, it contends that it may not be held vicariously liable for Able's negligence, even though at the time thereof Able was operating the tractor-trailer over a highway which he would have normally used on a return trip to the domicile terminal in Norristown.
The depositions of Granese, terminal manager at Norristown, demonstrate Service's control over Able's equipment not only while he was making a delivery for it between the pickup and delivery points, but also before pickup and after delivery. Thus, the majority of assignments given to Able out of the Norristown area was through the medium of telephone calls from Granese to Able's home, 20 miles away. Illustrative thereof was the assignment of September 8, 1960 when Granese phoned Able at his home and directed him to pick up a load of steel at the Fairless plant of U.S. Steel Co., 35 miles away, for delivery to Ohio. He gave Able, over the phone, the job number or order number so that Able could get into the plant at Fairless to pick up the particular load of steel. After picking up the load, Able went to the Norristown terminal, obtained the freight bills deliverable with the load, and then drove on to the delivery point in Ohio.
After making the delivery in Ohio, Able was under a duty of reporting or calling in to the nearest terminal there for a further work assignment. As noted above, he was instructed to pick up another load for delivery east at Port Newark.
It seems clear that Service could have directed Able to *594 wait in Ohio, or could have ordered return of the equipment empty to Norristown. So, too, if it had no present work for Able in that area, it could have, by virtue of its exclusive control under the lease, authorized his return to his Pottstown home and made further assignments by telephone call to him there.
Generally, "where one operates a vehicle under a governmental franchise in the field controlled thereby he assumes liability for the acts done by others to whom he grants permission to use that franchise." Trautman v. Higbie, 10 N.J. 239, 244 (1952). Thus, the holder of an Interstate Commerce Commission permit to operate motor vehicles in interstate commerce, having entered into a lease agreement permitting another to operate his truck in interstate commerce under such permit, would be liable for the negligent operation of such truck by the driver thereof. Ibid. The applicable federal legislation is found in 49 U.S.C.A. §§ 309, 312, 315 and 320. "Section 315 entitled `Security for protection of public' leaves no doubt in our minds as to the liability of an I.C.C. certificate holder for injuries or damages resulting from the negligent operation of a motor vehicle under such certificate." Trautman v. Higbie, supra, at p. 245. See, too, Venuto v. Robinson, 118 F.2d 679 (3 Cir. 1941), cert. den. C.A. Ross Agent, Inc. v. Venuto, 314 U.S. 627, 62 S.Ct. 58, 86 L.Ed. 504 (1941); and Hodges v. Johnson, 52 F. Supp. 488 (W.D. Va. 1943).
Service does not dispute this general rule of vicarious liability of an I.C.C. carrier, but it asserts that the rule applies only when the leased vehicle is actually being used in interstate commerce. It maintains that the holder of the I.C.C. permit is not liable for the negligent operation upon the public highway of the leased vehicle when that operation is for some personal purpose, as here, and unrelated to its business activities. It relies upon Schmidbauer v. Baltimore & Pittsburgh Motor Express Co., 228 Md. 637, 181 A.2d 325 (Ct. App. 1962), cited by the Law Division as the basis for its decision.
*595 In Schmidbauer, supra, a Mr. Selle, the owner-driver of a tractor, hauled trailers in interstate commerce for Baltimore & Pittsburgh Motor Express Co., franchised and duly certificated by the Interstate Commerce Commission. He had a written lease which was not for any specified period of time. On his trip prior to the accident involved in that case, Selle had driven from Ohio or Pennsylvania to Baltimore with his load. He delivered the load at the Baltimore terminal and turned in his manifest and bills. He knew at that time that there would be no further work assignment or trip for him until the following evening. The tractor was detached from the trailer and Selle drove the tractor to downtown Baltimore to see a movie. After the movie he drove his tractor to a place to get a sandwich and a couple of bottles of beer. He then started back to the terminal of Baltimore & Pittsburgh Motor Express Co. where a bunk room was maintained which drivers were permitted to use for sleeping when in Baltimore. While proceeding back from downtown Baltimore to the bunk room, the collision occurred for which the suit was brought. At the time of the collision, the tractor had the name of the carrier and its I.C.C. permit number displayed on its side in the form of decals, as in the instant case.
The Maryland court held that the I.C.C. carrier was not liable for the negligence of Selle because the equipment was being utilized at the time of the accident in an activity that was entirely disassociated with interstate commerce. It also ruled that the presence of the carrier's name and I.C.C. number on Selle's tractor at the time of the accident did not make it liable under 49 C.F.R. § 207.4 of the rules and regulations of the Interstate Commerce Commission, holding that those rules and regulations are applicable only when the leased vehicle is being utilized in interstate commerce, or in some activity that bears direct relationship thereto, rather than in some intrastate movement between interstate movements, such as Selle's driving his tractor from the movie to the terminal bunk room.
*596 Schmidbauer is somewhat distinguishable from the instant case. There, the movement of the tractor alone at the time of the accident was intrastate in character, Selle driving it solely for his own personal convenience from a movie in Baltimore to the terminal bunk room in the same city, during the waiting interval between interstate trips. Here, Able was returning his tractor-trailer from New Jersey to Pennsylvania in an interstate movement with the knowledge and consent of Service, at a time when Service had no further immediate use for the equipment in New Jersey. True, Able's return of his vehicle to Pennsylvania enabled him to use this means of transportation to accomplish a personal mission, a return home to his sick wife. But, at the same time, Service's approval of its return to Pottstown resulted in the vehicle's being placed in close proximity to the domicile terminal where it would be readily available for further work assignments. In fact, Service gave Able such an assignment about a week after its return.
In Hodges v. Johnson, supra, it was held that the I.C.C. carrier could not escape liability for the negligence of the driver of the leased truck simply because at the time of the accident the driver had completed his mission in interstate commerce and was returning with an empty truck. The court reasoned that the responsibility of the carrier attached not only while the leased truck was proceeding on its journey loaded, but also on the return journey while empty. In that case, Johnson, the truck owner, received 80% of the freight charges and the carrier received 20%  a mode of compensation analogous to that in the case before us.
American Transit Lines v. Smith, 246 F.2d 86 (6 Cir. 1957), adopted the rationale of Hodges v. Johnson and held that I.C.C. carrier liable for the negligent operation of the leased truck bearing the carrier's name on decals, even though the accident occurred while the truck was returning empty to Hammond, Indiana from Cleveland, Ohio, where it had delivered a load. In that case, the owner of the tractor-trailer was operating under a "trip lease" covering only the one-way *597 trip between Cleveland and Hammond. The carrier contended that the trip lease limited the liability to the time actually involved "from the point of origin to the destination indicated," i.e., from Hammond to Cleveland. The court noted the fact that the carrier "had exclusive control of [the owner's] vehicle and services when and if his services were needed, was evidence of continued control" and supported the finding that the carrier was liable.
In the instant case, Service had the exclusive right to control the movement of Able's tractor-trailer, under the terms of the written lease between them. Moreover, 49 C.F.R. § 207.4(4) expressly requires that the lease between the authorized carrier and the owner of the equipment
"Shall provide for the exclusive possession, control, and use of the equipment, and for the complete assumption of responsibility in respect thereto by the lessee * * *."
Able's return trip empty from Port Newark to Pennsylvania was authorized by Service and constituted an interstate movement of the vehicle upon the public highways. It is immaterial that Able received no compensation for the return trip, or that his return with the permission of Service was to serve some personal purpose. As stated in American Transit Lines, supra, 246 F.2d, at p. 88, "the existence of control is proved, not only by its exercise, but also by the right of exercise."
So, too, in Leotta v. Plessinger, 8 N.Y.2d 449, 209 N.Y.S.2d 304, 171 N.E.2d 454 (Ct. App. 1960), the fact that the driver of the leased tractor had the accident while searching for a return load from a third party after delivering the lessee's load under a one-trip lease, was held not a bar to the lessee's liability under § 207.4(4), the lease being still in effect and the leased tractor bearing the lessee-carrier's legend at the time of the accident. To the same effect, see Mellon National Bank and Trust Company v. Sophie Lyons, Inc., 289 F.2d 474 (3 Cir. 1961), holding the lessee-carrier liable, even though the leased tractor was being used at the *598 time of the accident to haul a load for some third person without the knowledge of the lessee-carrier.
Mellon noted that the I.C.C. carrier could have effectually eliminated its responsibility for the truck's use during the term of the lease in only one way, i.e., (1) removing any legend showing it as the operating carrier, displayed on such equipment; and (2) obtaining the receipt upon surrender of possession, as called for by § 207.4(7) (b). In the case before us, the lease between Service and Able was still in full force and effect, Service had not caused the removal of the decals showing it as the operating carrier, and the receipt required by § 207.4(7) (b) had not been obtained.
One of the principal purposes of the I.C.C. regulations is the protection of the traveling public upon the highways. American Trucking Ass'ns. v. United States, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953). Under the circumstances herein, Service was responsible for any negligence on the part of the driver of the leased equipment. It was error to grant summary judgment, dismissing plaintiff's action against Service. Since Able himself, as driver of the tractor-trailer, would also be personally liable to plaintiff for his negligence, if any, he may not be dismissed from the action. The rights of Service and Able inter se cannot be determined at this time and must await for a determination upon factual development at a trial.
The summary judgment in favor of Service is reversed.