Jerry and Kathryn Phillips filed an action to recover damages for personal injuries sustained by them when their automobile collided with a tractor-trailer truck. Originally the complaint was filed against Arthur Bernhisel, the driver of the truck; and Travis Wilhite, the owner. Later, the Phillipses amended their complaint, adding J.H. Transport, Inc., and Smith Poultry and Produce Company, Inc. ("Smith Poultry"), as defendants, alleging that the truck was owned, leased, or operated under the authority of one or both of those two companies. After evidence was presented to a jury, the trial court entered a judgment by consent for the Phillipses and against Wilhite and Bernhisel in the amount of $30,000, with the execution of the judgment stayed pending further orders of the court. The trial court granted motions for directed verdict filed by J.H. Transport and Smith Poultry. This appeal is from the judgment for those two defendants based on the directed verdict.
The record indicates that a 1975 Peterbilt truck, owned by Wilhite, was under a long term lease to Smith Poultry on or about April 23, 1986. Wilhite entered into a trip lease with J.H. Transport for this truck to transport potatoes from Greenville, Michigan, to Chattanooga, Tennessee. Prior to the trip, the Peterbilt truck developed mechanical problems and Wilhite made arrangements, with J.H. Transport's approval, for a 1975 Kenworth truck to be substituted in its place. It appears that this Kenworth truck was already under a long term lease[1] to J.H. Transport, and consequently, no new trip lease was executed with Wilhite.
Bernhisel left Greenville, Michigan, on April 25, 1986, and arrived in Chattanooga on April 27, 1986. After delivering the potatoes, Bernhisel left Chattanooga and drove to meet Wilhite in Cullman, Alabama, as the truck was scheduled to be leased on April 29 to Smith Poultry. The accident involving the Phillipses occurred just east of Cullman on April 28, 1986.
The Phillipses argue that the trial court improperly granted the defendants' motions for a directed verdict and that the question of whether Smith Poultry and J.H. Transport were vicariously liable should have been submitted to the jury.[2] They *Page 68 
base their argument on two theories: (1) the Interstate Commerce Commission ("I.C.C.") Regulations and (2) common law rules of agency. First, they argue that Smith Poultry and J.H. Transport were liable because J.H. Transport's I.C.C. number was affixed to the side of the Kenworth truck at the time of the accident. They contend that liability exists by virtue of I.C.C. Regulation 49 C.F.R. § 1057.4(d)(1) (now located at 49 C.F.R. § 1057 1058). The Phillipses argue that both Smith Poultry and J.H. Transport had an affirmative duty to remove all names and numbers from the side of the truck, and they citeEx parte Hicks, 537 So.2d 486 (Ala. 1988); Simmons v. King,478 F.2d 857 (5th Cir. 1973); Price v. Westmoreland, 727 F.2d 494
(5th Cir. 1984) (carrier lessee liable for passenger's injuries despite fact that driver exceeded his authority); and Rodriguezv. Ager, 705 F.2d 1229 (10th Cir. 1983) (carrier lessee liable for injuries sustained in accident despite fact that driver was not on mission for carrier), for the proposition that the I.C.C. regulations preempt state common law and create a presumption of an employment relationship between a driver and a company whose placards identify the vehicle.
The regulation at 49 C.F.R. § 1058.2 states:
 "There shall be displayed on both sides of each vehicle operated under its own power, either alone or in combination, except as otherwise provided in this part respecting vehicles in driveaway service, and those used under a continuing interchange or lease arrangement between common carriers of passengers by motor vehicle, the name, or trade name, of the motor carrier under whose authority the vehicle or vehicles is or are being operated, and the certificate, permit, or docket number assigned to such operating authority by the Interstate Commerce Commission. Such certificate, permit, or docket number, or numbers, shall be in the following form: 'I.C.C. __________,' but shall not include any sub number which may have been assigned. . . ."
Additionally, §§ 1057.12(c)(1) and 1057.31(d)(1) state, respectively:
 "Exclusive possession and responsibilities — (1) The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease."
 "Identification of Equipment — (1) The authorized common carrier shall identify power units in accordance with the Commission's requirements in Part 1058 of this chapter (Identification of Vehicles). Before giving up possession of the equipment, the carrier shall remove all identification showing it as the operating carrier."
(Emphasis added.)
Smith and J.H. Transport argue that the truck was not carrying a load and was not under a lease for either carrier. They contend that Wilhite had sole control over Bernhisel's activities and that Bernhisel was not an agent for either carrier. Additionally, Smith argues that it is not liable because its lease for the truck had not yet come into existence and its I.C.C. numbers were not on the Kenworth truck at the time of the collision. A thorough review of the records shows this to be correct. The Peterbilt, not the Kenworth, was under a long-term lease to Smith and had Smith's I.C.C. number displayed on it. However, because that was not the truck involved in the collision, and because that lease is of no consequence to this case, we find that the directed verdict in favor of Smith was correct. Smith's judgment based on that directed verdict is affirmed.
J.H. Transport also argues that the directed verdict in its favor was correct. It contends that the Kenworth was under lease only for the delivery of the potatoes and that its obligation and control of the truck terminated in Chattanooga. J.H. Transport argues that the mere presence on the Kenworth of its I.C.C. decals is *Page 69 
insufficient to make it liable for the conduct of Bernhisel and that he was not under its control. Additionally, it cites case law stating that no administrative presumption arises as to ownership when the actual owner of a vehicle is known. We agree that in this case there is no dispute that Wilhite is the owner of the truck; nevertheless, proof that a vehicle is actually owned by a third party, without more, does not destroy an administrative presumption that the vehicle was operated by a carrier's agent acting within the scope of his employment.Sears, Roebuck Co. v. Hamm, 38 Ala. App. 258, 81 So.2d 915
(1955). J.H. Transport argues that the existence of a long-term lease was never conclusively proved at trial. Notwithstanding its contentions, in the alternative it argues that even if the truck was under lease to it it is not liable because Bernhisel was not acting within the scope of his employment.
Despite J.H. Transport's arguments, we conclude that a fact question was presented as to whether the Kenworth was under lease to it at the time of the accident. For example, it is uncontradicted that Bernhisel was dispatched by, and was qualified to drive for, J.H. Transport and was engaged in its mission while in Chattanooga. Bernhisel was not qualified to drive for Smith Poultry. Moreover, despite J.H. Transport's contention that the long-term lease was never conclusively proved at trial, the fact that no new trip lease was executed when the Kenworth was substituted for the disabled Peterbilt is circumstantial evidence to be considered along with other evidence that the Kenworth was already under a long-term lease to J.H. Transport. Bernhisel testified that Norma Timmons, J.H. Transport's dispatcher, told him that a new trip lease was unnecessary because the Kenworth truck was already under a long-term lease to J.H. Transport.
"Q. What did Norma tell you?
 "A. It was fine because the truck was already leased to J. H.
"Q. What truck?
"A. The '75 Kenworth.
 "Q. Mrs. Timmons told you already that the truck was leased to them?
"A. Yes, sir.
". . . .
 "THE COURT. [Outside the hearing of the jury]: You are telling me for the record now that the truck that you drove and had the accident in out here in Cullman County was leased to J. H.?
"A. Yes, sir.
 "THE COURT. But, you had been driving it on a trip lease?
"A. No, I hadn't.
 "THE COURT. From Greenville, Michigan, to Chattanooga?
"A. I wasn't driving on a trip lease.
"THE COURT. All right. As far as you know?
"A. Right."
The fact that J.H. Transport's name and I.C.C. number remained on the Kenworth provides further evidence that that truck was under a long-term lease to, or was otherwise under the control of, J.H. Transport.
In Hicks, supra, a case similar to the one now before this Court, plaintiff filed an action to recover for damages she and her granddaughter sustained when a tractor trailer truck collided with their automobile. In that case, because neither the owner nor the driver was qualified to transport goods in interstate commerce, an authorized carrier's I.C.C. numbers were displayed on the truck. In reversing the directed verdict in favor of the carrier, the Court reasoned:
 " '[W]here one operates a motor carrier under a government franchise, he assumes liability for acts done by others to whom he grants permission to use his franchise and permit.' He may not delegate his rights under his franchise and permit and thus avoid liability. See Trautman v. Higbie, 10 N.J. 239, 89 A.2d 649 (1952); Felbrant v. Able, 80 N.J. Super. 587, 194 A.2d 491 (1963); Phillips v. American General Insurance Co., 376 S.W.2d 808
(Tex.Civ.App. 1964); Dixie Stage Lines v. Anderson, 222 Ala. 673, 134 So. 23 (1931); Western Ry. of Alabama v. Turrentine, 197 Ala. 603, 73 So. 40
(1916). The reasoning in support of this rule is the notion that *Page 70 
transportation of freight upon public highways, often by means of large trucks and trailers, is fraught with an enormous danger to the traveling public. Hodges v. Johnson, 52 F. Supp. 488 (W.D. Va. 1943)."
537 So.2d at 489. While recognizing other decisions to the contrary, this Court held the carrier liable despite the fact that the collision occurred while the carrier was returning from a delivery with an empty trailer.
In Empire Fire Marine Ins. Co. v. Truck Ins. Exchange,462 So.2d 76 (Fla.Dist.Ct.App. 1985), a carrier was found liable, pursuant to I.C.C. regulations, for injuries sustained by a passenger even though the accident occurred after the driver had made his delivery. The court reasoned that the I.C.C. regulations controlled, despite the fact that the driver was en route to a lounge and the fact that the passenger/plaintiff injured in the accident was a trespasser as to the carrier. The court concluded that because the truck was under a long-term lease, the carrier had possession and control of the truck, including full responsibility to the public.
Correspondingly, in Cosmopolitan Mutual Ins. Co. v. White,336 F. Supp. 92 (D.Del. 1972), a carrier's insurer was held liable despite the fact that the driver was picking up a delivery for a third party and was not engaged in the business of the carrier. The court stated that because the carrier failed to comply with the I.C.C. regulations the lease was still in effect and the carrier was not relieved of its statutory obligation, despite the fact that the carrier had sent a letter to the owner purporting to conclude the lease. Although the plaintiffs failed to join the carrier before the statutory period of limitations had run, the driver was also covered by the carrier's insurance policy by virtue of the lease agreement; therefore, the carrier's insurance company was liable. See also Mellon National Bank Trust Co. v. SophieLines, Inc., 289 F.2d 473 (3d Cir. 1961) (I.C.C. carrier liable for negligence of driver even though driver was carrying load for another company without carrier's approval); Cox v. BondTransportation, Inc., 53 N.J. 186, 249 A.2d 579 (1969) (carrier liable even though driver en route to his home); Turnbow v.Hays Freight Lines, Inc., 15 Ill. App.2d 57, 145 N.E.2d 377
(1957) (carrier liable for injuries occurring while driver was driving to a motel after delivery of a load); National TrailerConvoy, Inc. v. Saul, 375 P.2d 922 (Okla. 1962); Felbrant v.Able, 80 N.J. Super. 587, 194 A.2d 491 (1963) (carrier liable for injuries sustained despite fact that driver was on his way home after delivery).
These I.C.C. regulations were promulgated to establish responsibility in the interstate trucking business for the protection of the public. As stated in Trans-american FreightLines v. Brada Miller Freight Systems, 423 U.S. 28,96 S.Ct. 229, 46 L.Ed.2d 169 (1975),
 " 'The purpose of the rules is to protect the industry from practices detrimental to the maintenance of sound transportation services consistent with the regulatory system,' and to assure safety of operation. 'So the rules in question are aimed at conditions which may directly frustrate the success of the regulation undertaken by Congress.' It is apparent, therefore, that sound transportation services and the elimination of the problem of a transfer of operating authority, with its attendant difficulties of enforcing safety requirements and of fixing financial responsibility for damage and injuries to shippers and members of the public, were the significant aims and guideposts in the development of the comprehensive rules."
423 U.S. at 37, 96 S.Ct. at 234 (quoting American TruckingAss'ns v. United States, 344 U.S. 298, 73 S.Ct. 307,97 L.Ed. 337 (1953)) (citations omitted).
In light of the purpose behind the promulgation of the I.C.C. regulations, we are persuaded that the better rule is to require carriers to remove their placards prior to relinquishing possession at the termination of their lease. Failure to comply with the I.C.C. regulations raises a presumption that the equipment is still under the control and lease of the carrier. While *Page 71 
this imposes a burden on carrier lessees, that burden is justified by the fact that a carrier has no authorization to transport interstate goods without the presence of the I.C.C. decal. There was evidence presented from which a jury could have determined that the Kenworth was still under lease to, or was otherwise under the control of, J.H. Transport. Therefore, we reverse the judgment based on the directed verdict in favor J.H. Transport.
For the foregoing reasons, the judgment is affirmed as to Smith Poultry, but is reversed as to J.H. Transport.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and JONES, SHORES, ADAMS and HOUSTON, JJ., concur.
MADDOX and STEAGALL, JJ., concur in the result.
[1] No written lease was produced at trial, however.
[2] This case is governed by the "scintilla rule" because the suit was filed prior to the effective date of Ala. Code 1975, §12-21-12.