EDWARD A. COX, PLAINTIFF-APPELLANT, v. BOND
TRANSPORTATION, INC., DEFENDANT-RESPONDENT.

MICHAEL F. MURPHY, BY HIS GUARDIAN *AD LITEM*,
IRIS R. MURPHY AND DENNIS MURPHY, PLAINTIFFS-
APPELLANTS, v. BOND TRANSPORTATION, INC., A
CORPORATION OF THE STATE OF NEW JERSEY, DE-
FENDANT-RESPONDENT.

Argued November 4, 1968—Decided January 27, 1969.

188

190

*Mr. Vincent C. DeMaio* argued the cause for appellants (*Mr. Vincent C. DeMaio* attorney for appellant Edward A. Cox; *Mr. Kenneth E. Joel* attorney for appellants Michael F. Murphy and Dennis Murphy).

*Mr. Carroll A. Morley* argued the cause for respondent (*Mr. Carroll A. Morley,* of counsel; *Messrs. Lamb, Blake, Hutchinson & Dunne,* attorneys).

The opinion of the court was delivered by

FRANCIS, J. In the consolidated motor vehicle negligence actions which are the subject of this appeal, plaintiffs Cox and Murphy recovered substantial personal injury verdicts against defendants Bond Transportation, Inc. and Manuel McCaskill. Bond's subsequent appeal to the Appellate Division resulted in a reversal and a remand for entry of judgments in its favor. 99 *N. J. Super.* 335 (*App. Div.* 1968). *McCaskill* did not appeal. We granted certification on plaintiffs' petition. 51 *N. J.* 571 (1968).

McCaskill was the owner and operator of the tractor involved in the collision which resulted in these damage actions. The basic issue is whether by reason of the Inter-

state Commerce Commission regulations defendant Bond
Transportation, Inc., as a certificated interstate carrier, should
be deemed to have had such possession and control over the
tractor at the time of the accident as to make it liable for
McCaskill's negligent operation. The trial court held that
under the evidence adduced the issue was a factual one for
jury determination.

The situation out of which these claims arose is unusual.
For many years prior to January 22, 1965, defendant Bond
had been engaged in the intrastate and interstate trans-
portation of oil. Its principal place of business was in
Woodbridge, New Jersey. It held an Interstate Commerce
Commission Franchise as an interstate carrier, the certifi-
cate number being I. C. C. 15727. Bond had a number of
tractors and tank trailers of its own which were used in
the ordinary operation of its business; all had the company
name and I.C.C. number painted on them. In the busy
season, *i. e.,* in advance of and during the cold weather,
additional tractors were hired from their owners to assist
in the transportation of oil by hauling Bond tank trailers.
Such owners usually drove the vehicles personally. They are
described in the record as lease-operators (of which more
later). The company furnished all of them with a metal de-
cal bearing the Bond name and I.C.C. number which decal
was fastened to the side of the tractor. According to Daniel
Harrison, Vice-President and part-owner of Bond, the In-
terstate Commerce Commission regulations required the name
of the lessee and the decal to be placed on the rented tractors.
Five to seven such lease-operators had been so engaged by
Bond for a number of years and were working in that ca-
pacity at the time of the accident involved here. These op-
erators delivered their loads during the day to the places
designated by Bond's dispatcher. On returning to the Bond
yard or terminal at the end of the day's work, they would
be given their assignment for the next day by the dispatcher
or they would receive it from him by telephone later in the
evening.

Defendant Manuel McCaskill was the owner of a tractor of the type hired by Bond. By arrangement with Harrison he was engaged in February 1964 as a lease-operator under what was called an oral lease. McCaskill described himself as a seasonal operator for Bond. He testified that during his first discussion with Harrison he was told that if he "worked out" he would be kept busy during the season. He said also that in that period he could not haul for anyone else without the company's consent. During the offseason he could and did seek other work. It is plain from his statements that (1) he considered Bond to have had first call in season on the use of his tractor and his services as its driver, and (2) under the oral lease his tractor was to be available for interstate as well as intrastate transportation. Under the agreement he was to receive 65% of the charges made by Bond for each of his hauls. This was the same rate of pay as all other lease-operators received.

After February 1964, McCaskill worked sporadically for Bond until November 1964. In the summer of 1964, except for a few occasions in July, when Bond called him, he sought work from other companies. From December 7 until January 22, 1965 he hauled fairly regularly and exclusively for Bond.

McCaskill lived in Long Branch, N. J., and the Bond terminal was at Woodbridge, N. J. His work day began at the terminal at 4:00 or 5:00 A. M., and it was necessary for him to be there at that time. Like the other lease-operators, on return to the terminal at the end of the day he would receive the next morning's assignment if it had been decided upon at that time; if not, it would be given to him over the telephone later in the evening by the dispatcher. This meant, of course, that McCaskill would hold himself and his tractor available to respond to the assignment by appearing at the terminal between 4:00 and 5:00 A. M. the following morning. Inferably also, on his version of the agreement with Bond, he could not seek other work until after he received the evening message that his services would

not be needed the next day. In order to facilitate the operation he would either leave his tractor at the terminal at the end of the day, sometimes attached to Bond's trailer, or he would detach the trailer and drive the tractor to his home and back to the terminal in the morning. At one point he testified he drove the tractor home and back most of the time; at another point he said he generally left the tractor at the yard and used a light pick-up truck, also owned by him, for the trip to and from the yard. Harrison's statements on this subject were somewhat at variance. He said that most of the time McCaskill detached the trailer at the end of the day and drove the tractor home and back again in the morning.

Harrison described McCaskill as a lease-operator and their relationship as arising out of an oral lease. He regarded the connection between them as a loose one, a seasonal one, on a day-to-day basis whenever Bond needed McCaskill's services. He said that the latter was free to work for anyone else at any time and was under no obligation to hold himself available for Bond.

The credibility of Harrison's testimony on some aspects of the arrangement between his company and McCaskill was open to serious question. Obviously the jury decided the issue against him. Harrison was called first as a plaintiff's witness and his direct, cross and redirect examination covers 48 pages of the record; he was called later as a defense witness and the direct, cross and up to the last question on redirect examination takes up 47 pages of the record. This last question, a most leading one, put by his company's attorney was:

"Q. Isn't that also a fact sir, that when you, Mr. Harrison, on behalf of Bond Transportation hired Mr. McCaskill on this leased operation, that the agreement was that he was to haul strictly intrastate, within the state of New Jersey when he hauled for Bond. Is that correct?
A. Yes."

It is the fact that with the exception of one interstate movement all of McCaskill's trucking for Bond was intrastate. But it does not follow therefrom that his lease-operator agreement was limited to intrastate work. There is substantial evidence to show that his engagement was an unqualified one — to assist generally in the transportation operations of Bond without any specification or restrictions respecting either interstate or intrastate operation. Moreover, the circumstances reveal that Bond expressly qualified McCaskill to operate his tractor as an interstate carrier. When McCaskill first became a lease-operator of Bond, according to one portion of Harrison's testimony the company gave him a metal decal to be screwed to the side of his tractor. It contained the company name and I. C. C. number. Its size does not appear. Harrison said the decal was given because the Interstate Commerce Commission regulations required it, and that thereafter it was always on the tractor. He said further that such a decal or sign was not needed for intrastate carriage; it was needed only to qualify a vehicle for interstate transportation.

McCaskill agreed that it was necessary to have a legend on the door of his tractor showing the name of the company for which he was operating and its I. C. C. authorization number, and further, that Bond required him to have it there. He said, however, that no metal decal was available for his truck at the time. Consequently the employee in charge of Bond's garage gave him a cardboard and a company stencil to prepare his own sign. He did so and placed it on his tractor. It read: "Bond Transportation, Woodbridge, N. J., I. C. C. 15727" in letters of substantial size. It remained attached at all times thereafter, even on the occasions during the winter season when he drove the tractor between the terminal and his home. Harrison knew this and never told him to remove it. There is no doubt that it was there when the accident in question happened. Moreover, the tractor was taken back to the Bond terminal from the scene

of the accident and, according to McCaskill, he used it in Bond's hauling work thereafter.

We do not regard of major significance the conflict in the testimony of McCaskill and Harrison as to whether the tractor at all times bore the Bond metal decal as asserted by Harrison, or the cardboard sign described by McCaskill, or whether it bore both decal and sign, as the jury could have found. The legal effect of decal and sign is substantially the same.

Harrison testified also that his company subjected the equipment of the lease-operators to the same safety inspection rule as was applied to its own equipment. In addition, he considered that the lease-operators, such as McCaskill, were subject to the same company supervision while they were on the road as were the regular employee-operators.

On January 22, 1965, at the customary early morning hour, McCaskill drove from his Long Branch home to the Woodbridge terminal in his light pick-up truck. His tractor bearing the Bond sign had been left there at the end of the previous day's work. He hooked the tractor to the tank-trailer and transported four or five loads of oil from the Paragon Oil Company in Newark, N. J. to a Bond customer in Whippany, N. J. On completion of his assignment he returned to the terminal at Woodbridge. His pick-up truck would not start so he decided to leave it there and drive home and back to the terminal in the tractor. No one suggests that his seasonal work for Bond had ended, or that the decal was removed or ordered removed from the tractor before McCaskill drove out of the yard. While moving south on Route 35 he became involved in a collision with vehicles of the plaintiffs Cox and Murphy.

Subsequently Cox and Murphy brought this action against McCaskill and Bond Transportation, Inc. The theory of the action was twofold: (1) Bond was liable for McCaskill's negligence under the common-law *respondeat superior* doctrine; (2) by reason of the Interstate Commerce Commission regulations McCaskill, as a lease-operator, was operating

his tractor within Bond's franchise at the time of the accident and thus Bond was vicariously liable for McCaskill's negligence. The trial judge held that McCaskill was an independent contractor, that he was driving as such when the accident happened, and therefore common law principles of *respondeat superior* were not applicable. Consequently he granted the company's motion to dismiss that claim. The judge concluded, however, that a jury question existed as to whether Bond was vicariously liable for McCaskill's negligence because he was a lease-operator whose tractor bore either a metal decal or a sign indicating that he was operating it on the public highway under Bond's I. C. C. franchise and within the activity authorized by it. The jury was charged generally with respect to the Interstate Commerce Commission regulations and the nature of the relationship created thereby between the franchised carrier and a lease-operator. At the conclusion of the charge the following special interrogatory on the subject was submitted to them to be answered at the conclusion of their deliberations:

"Do you find that at the time of the accident Manuel McCaskill was operating his tractor in carrying on the activity of Bond Transportation Company?"

On returning verdicts for the plaintiffs, the jury answered the question in the affirmative. As indicated hereafter this answer signified a finding by the jury that McCaskill had been engaged to operate in intrastate and interstate commerce, had been qualified by Bond to so operate, did in fact drive in interstate commerce, and at the time of the accident in driving the tractor home he was engaging in an activity which was at least in part for the benefit of Bond. The resulting judgments against Bond were reversed on appeal on the ground that McCaskill was not operating his tractor *in interstate commerce* at the time of the accident and therefore Bond could not be deemed to be in possession and control of it within the meaning of the Interstate Commerce

Commission regulations. Such regulations not being applicable, the Appellate Division declared McCaskill's status was that of an independent contractor for whose conduct Bond could not be held liable vicariously.

I

In 1935 Congress enacted the Motor Carrier Act, now Part II of the Interstate Commerce Act, 49 *U. S. C.* § 301 *et seq.* (1964). Under its authorization the Interstate Commerce Commission adopted comprehensive rules regulating the conduct and operation of the motor truck industry in interstate commerce. Many of them related to the safety of the equipment to be used on the highways and to the physical condition of the operators driving it. As a result of these regulations a substantial number of certificated carriers began to use equipment owned by non-franchised truckers. This was accomplished by a variety of leases and other arrangements, written and oral (frequently for a one-way trip or a single round trip) under which such owner-operator truckers carried on the operations of the authorized carrier. The use of equipment of non-franchised owner-operators was not unlawful under the Act or the regulations. In contracting with such persons the carriers took care to constitute them independent contractors. In this way the franchised carriers were able to avoid the Commission safety regulations that had been prescribed for equipment and drivers in order to protect the public. Moreover, many of the noncertificated owner-operators were itinerant truckers, known as "gypsies," who had poor equipment and little financial capacity. These satellite practices, which are discussed at length in *American Trucking Assos. v. United States,* 344 *U. S.* 298, 73 *S. Ct.* 307, 97 *L. Ed.* 337 (1953) and *Christian v. United States,* 152 *F. Supp.* 561 (*D. Md.* 1957), came under investigation by the Interstate Commerce Commission, and in 1951 and 1956 regulations designed to remedy the evil, particularly the trip-leasing, were adopted pursuant to 49 *U. S. C.* § 304(*e*).

*Section* 304(*e*) authorized the Commission to prescribe regulations "with respect to the use by motor carriers (under leases, contracts or other arrangements) of motor vehicles not owned by them, in the furnishing of transportation of property * * *." Specifically the agency was given authority to adopt regulations

"(1) * * * requiring that any such lease, contract, or other arrangement shall be in writing and be signed by the parties thereto, shall specify the period during which it is to be in effect, and shall specify the compensation to be paid by the motor carrier, and requiring that during the entire period of any such lease, contract, or other arrangement a copy thereof shall be carried in each motor vehicle covered thereby; and

(2) such other *regulations* as may be reasonably necessary in order *to assure that while motor vehicles are being so used the motor carriers will have full direction and control of such vehicles and will be fully responsible for the operation thereof in accordance with applicable law and regulations,* as if they were the owners of such vehicles, including the requirements prescribed by or under the provisions of this chapter with respect to safety of operation and equipment and inspection thereof, which requirements may include but shall not be limited to promulgation of regulations requiring liability and cargo insurance covering all such equipment." (Emphasis added.)

Pursuant to this authority the Commission adopted regulations governing the leasing of owner-driven tractors for use in the business of franchised carriers engaged in interstate transportation. 49 *C. F. R.* 1057.4 (1968) provides that authorized carriers may perform authorized transportation with equipment owned by non-franchised truckers only by lease, contract or other arrangement in writing. When the equipment is to be operated by the owner or his employee for the authorized carrier, the lease, or other writing, shall specify its duration which "shall be not less than 30 days" (with certain exceptions not material here). *Section* 1057.4 (*a*)(3). It must provide "for the exclusive possession, control, and use of the equipment, and for the complete assumption of responsibility in respect thereto, by the lessee for the duration" of the lease. *Section* 1057.4(*a*)(4). It must

specify the compensation to be paid by the lessee, and fix the inception and termination dates of the use of the equipment. A copy of the lease or a certified statement prepared by the carrier describing it, is required to be carried on the equipment. *Section* 1057.4(*a*)(*7*)(*d*)(*2*). Additional rules direct that when possession of the equipment passes to the carrier a receipt therefor stating the date and time of day the possession begins shall be given to the owner, and on relinquishment of possession a similar receipt shall be obtained by the carrier from the owner stating the date and the hour of the retaking of possession. *Section* 1057.4(*a*)(*7*)(*b*). Before taking possession the carrier is under a duty to inspect or have the leased equipment inspected by a competent person to insure that it satisfies the safety requirements of the Commission, and a detailed report on a form specified must be executed and filed. *Section* 1057.4(*a*)(*7*)(*c*).

Another subsection of the rule of considerable significance in the present case deals with the matter of identification of the leased equipment. *Subsection* (*7*)(*d*) orders the carrier acquiring the use of equipment under *Section* 1057 to identify itself properly and correctly on the equipment as the operating carrier during the period of the lease. It says also that if a removable device is used for the purpose, the device shall be on durable material such as wood, plastic, or metal, and shall bear a serial number in the authorized carrier's own series. *Subsection* (*7*)(*d*)(*1*) contains the mandatory direction that the carrier operating such equipment "shall remove any legend, showing it as the operating carrier, displayed on such equipment," as well as any removable device showing it to be the operating carrier, "before relinquishing possession of the equipment."

The validity of these regulations, substantially in their present form, and specifically of the requirement of a written 30-day lease when a certificated carrier leases equipment, such as a tractor, for use in its authorized transportation, was sustained by the United States Supreme Court in *American Trucking Assos. v. United States, supra.*

In the *American Trucking* case the most ardent attack on the regulations was directed against the minimum 30-day written lease requirement for the use of lessor-driven equipment in the business of the carrier. The Supreme Court found ample evidence in the record to show that the evil of trip-leasing adversely affected the entire Congressional regulatory scheme. The Court sustained the rule as being within the Commission's statutory authority. It was said to be reasonably designed to protect the traveling public on the highways from irresponsible independent contractor-lessors and their unsafe equipment, as well as to prevent certificated carriers from evading their responsibility in that connection through engagement of irresponsible persons.

After the *American Trucking* decision the attack on the rule continued and further hearings were held by the Commission. They resulted in the reaffirmance of the basic regulation, although some exceptions were approved (not material here) probably as the result of criticisms voiced in the dissenting opinion of two members of the Court. In its 1950 and 1956 reports, quoted in *Christian v. United States, supra,* 152 *F. Supp.,* at *p.* 567, the Commission said:

"The salutary objectives of that rule we think bear repeating. They are to insure responsibility for, and control over, the leased equipment by the lessee carrier, when the equipment is operated by the owner or employees of the owner. These are basic requirements that are inherent in the relation of the for-hire carrier to the public. When they are lacking, the chaotic conditions that preceded enactment of the Motor Carrier Act, 1935 inevitably ensue."

and:

"It is clear that the hard core of the problem confronting the Commission * * * has been the owner-operator trip lease and its attendant evils, such as widespread indifference to carrier responsibility, to safety of operations, and to the scope of carrier operating authority."

There can be no doubt that the Commission regarded the trip-leasing arrangement as a device which made it difficult

for a member of the public injured by the operation of a vehicle so leased to fix carrier responsibility. The regulatory aim was to remedy that evil and Congress concurred in the objective. See, *House Report No. 2425 — Motor Carriers — Trip Leasing, 3 U. S. Code Cong. and Ad. News, 84th Cong. 2d Sess., p. 4304* (1956).

The regulations described above have the force and effect of law. A franchised interstate carrier cannot evade them by making an oral or written lease with an owner-operator of equipment for a trip, for a day or for an indefinite period, which attempts to exclude or to limit their application. When such a carrier engages an owner-operator of a tractor intending to have him transport goods for it on the public highways in interstate commerce, and indicates that intention by qualifying him therefor by means of the required identification and decals, the regulations must be deemed included in their contract. *Vance Trucking Co. v. Canal Insurance Co.,* 249 *F. Supp.* 33, 39 (*D. S. C.* 1966); *G. L. Christian & Associates v. United States,* 320 *F. 2d* 345, 350–351, 160 *Ct. Cl.* 58 (1963); *Hartford Acc. & Indem. Co. v. Major,* 81 *Ill. App. 2d* 251, 226 *N. E. 2d* 74, 78 (*App. Ct.* 1967); and see *Saffore v. Atlantic Cas. Ins. Co.,* 21 *N. J.* 300, 310 (1956); *Leotta v. Plessinger,* 8 *N. Y. 2d* 449, 209 *N. Y. S. 2d* 304, 171 *N. E. 2d* 454, 458 (*Ct. App.* 1960). Thus when a lessor-operator is engaged by the carrier for operation within the scope of the regulations he becomes what has been described as a "statutory" employee of the carrier, *Brannaker v. Transamerican Freight Lines, Inc.,* 428 *S. W. 2d* 524, 535 (*Mo. Sup. Ct.* 1968), and the relation between them, whether oral or written, is governed by the regulations. And when the relation arises, the carrier-lessee takes "exclusive possession, control, and use of the equipment, and * * * the complete assumption of responsibility in respect thereto, * * * for the duration of said * * * lease, * * *" (*Section* 1057.4(a)(4)) which, as has been shown, must be for a minimum period of 30 days. *Section* 1057.4(a)(3).

██ Defendant Bond argues that since *Section* 1057.4 of the regulations says that a carrier "may perform authorized transportation" with lessor-owner operated equipment, the regulations, and particularly *Section* 1057.4(*a*) (4), apply only when the equipment actually is engaged in its business on a public highway in interstate commerce. The contention requires analysis. If a franchised carrier needs the use of owner-operated tractors in his business, he may lease them exclusively for intrastate or exclusively for interstate transportation, or he may engage them to be available for both intrastate and interstate operation. If he engages the lessor-operator expressly for intrastate carriage alone, and exercises no control over the operation of the vehicles, ordinarily the lessor is an independent contractor and the I. C. C. regulations would not apply to the localized transportation. If the lease is for interstate transportation, manifestly *Section* 1057.4 of the regulations does apply. If, however, there is evidence, even though conflicting, showing that the lessor-operator was engaged to be available generally in the carrier's business, both interstate and intrastate, and that the carrier by overt acts qualified him for such operation, and the jury finds that he was so engaged and qualified, then under the regulations the carrier must be held to have assumed "exclusive possession, control and use of" and to be responsible for the operation of the vehicle whenever it is being driven on the public highway in the interest of the carrier.

██ The last situation creates the problem here. It is neither sensible nor consistent with the basic intention of the Commission — protection of the public against dangers incident to the operation of franchise-authorized vehicles — to apply such a vacillating standard as Bond suggests for determining whether the carrier is responsible under *Section* 1057.4(*a*) (4) of the regulations for a particular movement of an owner-operated leased vehicle. For example, franchised carriers are required to provide liability insurance not only to cover vehicles owned and used by them in authorized trans-

portation, but also for non-owned equipment leased from the owner-operator to be used in such transportation. See 49 *U. S. C.* § 315; *Vance Trucking Co. v. Canal Insurance Co., supra.* Insurance coverage which would protect an injured member of the public one day when the lessor-operated tractor was in interstate carriage, and which would shift away the next day because the leased equipment was in intrastate operation making the operator an independent contractor, thus relieving the carrier of vicarious liability, cannot be the result envisaged by Congress or the Interstate Commerce Commission.

██ In our judgment the I.C.C. regulations designed to control the use of leased equipment must be construed most liberally in the interest of members of the public using the highways. Applying that principle in light of the history of 49 *U.S. C.* § 304(*a*) (7) (*e*) and the implementing regulations set out in *Section* 1057.4, we hold this view: When a lessor-operator is engaged by a franchised carrier to drive his equipment in the carrier's business, and the carrier qualifies or invests him with authority to engage in "authorized" transportation by giving him the decals or signs required by the Commission to show such transportation, *prima facie* the arrangement is within and subject to *Section* 1057.4 of the regulations.

█ In the present case it is undisputed that McCaskill and his tractor were engaged under an oral lease. He said the lease was for an indefinite period. It was for the season, *i. e.,* during the cold weather, and he could not work during the season for another carrier without Bond's consent. He received his daily assignment from the dispatcher and felt bound to honor it. In the 1964–65 season McCaskill had worked fairly regularly and exclusively for Bond for a month and a half before the accident. It is clear from his testimony that his engagement was not limited to intrastate operation. He was hired to truck in the Bond business, and beyond question a jury could find that he was to haul Bond's

trailers in both interstate and intrastate transportation when called upon to do so. In fact on one occasion in the six-week period noted above he did make an interstate trip and Bond obviously recognized that his lease authorized and required him to do so. In this connection it has been said that a person engaged in intrastate commerce by motor vehicle as a regular occupation is not exempt from Interstate Commerce Commission regulation "if he undertakes also even casual or occasional transportation" in interstate commerce. *Bass v. United States,* 163 *F. Supp.* 1 (*W. D. Va.* 1958). In fact, the Commission by administrative ruling has indicated that the leasing regulations apply unless the non-owned lessor-operated equipment is used solely in intrastate commerce. *Adm. Ruling No.* 104, 2 *C. C. H. Fed. Carr. Rep.* § 25, 104 (1957). This ruling gives recognition to the Congressional intention that the use and operation of leased vehicles be put on a parity with equipment owned and operated by the authorized carrier and operated by its own employees. *Brannaker v. Transamerican Freight Lines, Inc.,* 428 *S. W. 2d* 524 (*Mo. Sup. Ct.* 1968).

Under all the circumstances, it was open to the jury to find that McCaskill's lease arrangement was within *Section* 1057.4 of the regulations, *i. e.,* that it was for more than 30 days and was to continue until the end of the cold weather season as understood by the parties. By virtue of such lease Bond came into "exclusive possession, control, and use of the equipment" and assumed complete "responsibility" of it for the duration of the lease. *Section* 1057.4(*a*)(4). As long as the decals remained on McCaskill's tractor a strong presumption existed that it was engaged in authorized transportation and that Bond was still in exclusive possession, control and use of it and was completely responsible for its operation. See *Mellon Nat'l Bank & Trust Co. v. Sophie Lines, Inc.,* 289 *F. 2d* 473, 476–477 (3 *Cir.* 1961); *Leotta v. Plessinger, supra,* 8 *N. Y. 2d* 449, 209 *N. Y. S. 2d* 304, 171 *N. E. 2d,* at *p.* 458; and *cf. United States v. Drum,* 368 *U. S.* 370,

381–382, 82 *S. Ct.* 408, 7 *L. Ed. 2d* 360, 367–368 (1962);
*Calvine Mills, Inc. v. United States,* 221 *F. Supp.* 1019
(*D. N. J.* 1963). Bond could eliminate this presumption only
by conforming with the regulations, *i. e.,* (1) removing "* * *
any legend, showing it as the operating carrier, displayed on
such equipment, and * * * any removable device showing it
as the operating carrier, before relinquishing possession of
the equipment," *Section* 1057.4(*d*)(1), and (2) obtaining
the receipt called for by *Section* 1057.4(7)(*b*) which says
that "when the possession by the authorized carrier ends; it
or its employee or agent shall obtain from the owner of the
equipment, * * * a receipt specifically identifying the equip-
ment and stating therein the date and time of day possession
thereof is taken." And see, *Mellon Nat'l Bank & Trust Co. v.
Sophie Lines, Inc., supra,* 289 *F. 2d,* at *pp.* 476–477; *Leotta
v. Plessinger, supra,* 8 *N. Y. 2d* 449, 209 *N. Y. S. 2d* 304,
171 *N. E. 2d,* at *pp.* 456–458.

Thus under the cases, presence of the decal and
the Bond name on the door of the tractor at the time of the
accident strongly implies operation thereof by McCaskill
within the significance of *Section* 1057.4 of the regulations.
The fact that he was driving as an independent contractor,
as the trial court ruled, of itself has no important significance.
The statute, 49 *U. S. C.* § 304(*e*) and the regulations based
thereon, when applicable, eliminate the common law dis-
tinction between an independent contractor and an employee.
They create a type of statutory employment under which the
franchised carrier becomes responsible for the negligence of
the owner-operator at least when he is engaged in the ac-
tivities of the carrier. (In view of the public policy ex-
pressed by the regulations it can be argued persuasively that
when owner-operated equipment is leased by a carrier, the
exclusive possession, control and use thereof, and "complete"
assumption of responsibility imposed on the carrier for the
"duration" of the lease, subjects it to liability for the lessor's
negligent operation so long as the lessor is on the public high-

way with the permission of the carrier. *Cf. Mellon Nat'l Bank & Trust Co. v. Sophie Lines, Inc., supra,* 289 *F. 2d,* at *pp.* 476–477. But it is not necessary to deal with that problem in this case.) We have already indicated that there is no absolute requirement that the lessor-operator must be driving in interstate transportation at the time of an accident in order for the type of statutory employment envisioned by the regulations to exist. In our view when a lessor-operator is engaged for and authorized to operate in interstate business, as may be inferred upon the furnishing of a decal and a carrier name-sign for the leased equipment, and from the *actual use* thereof in interstate transportation on one occasion within a short time after the inception of the relationship, the carrier's responsibility for the negligence of the operator may be found during the period of the lease whenever the operation, whether intra or interstate, is in any way with the knowledge and for the benefit of the carrier.

The evidence clearly justified the presumption that McCaskill was engaged in authorized operation for Bond at the time of the accident. Does the fact that he had finished his work for the day and was driving intrastate to his home in his "decaled" tractor so overcome that presumption that as a matter of law the issue of the carrier's special type of vicarious liability should have been taken from the jury and judgment entered for Bond? We think not. As is apparent from his own testimony, Bond's vice-president knew McCaskill was driving between his home and the company terminal with considerable regularity. The presence of the decal and ownership legend on the tractor at all times signified implied authorization to do so. But more than this, the proof justified a factual inference for jury consideration that such operation served the special interest of and was of business benefit to both Bond and McCaskill. The company was aware of the uncertainty as to the time when McCaskill would receive word from the dispatcher about his next assignment. This fact was undisputed. Therefore the jury could find

that the oral lease bound him to hold himself and his trac-
tor available to report at the terminal at 4:00 or 5:00 A. M.
ready to start his transportation route, fully identified as en-
gaged in authorized operation, be it intra or interstate. Under
all the circumstances, we think it was for the jury to say
whether Bond had a special interest in and received a busi-
ness advantage from McCaskill's act in driving his tractor
home at the time of the accident. And in that connection in
our judgment the trial court was correct in submitting to
the jury the specific question whether "at the time of the
accident Manuel McCaskill was operating his tractor in
carrying on the activity of the Bond Transportation Com-
pany." The jury's affirmative answer was amply supported
by the evidence in the case, and it provided adequate basis
for the verdicts for the plaintiffs.

Although the Appellate Division accepted defendant's
contentions — that the I. C. C. regulations are not appli-
cable and that a lessor-operator must be considered an inde-
pendent contractor for whose negligence the carrier is not
responsible unless at the time of the accident he is actually
driving in interstate commerce — we disagree. As previously
indicated we think such a doctrine would subvert seriously
the Congressional objective of protecting the public against
the operation of franchised truckers on the roadways. Re-
search has revealed no case in this or a sister state in which
the same circumstances and the same legal issues were pre-
sented. Study of analogous authorities, however, has con-
vinced us that the trial court properly viewed the matter of
Bond's liability as one requiring determination by the triers
of the facts.

*Turnbow v. Hayes Freight Lines, Inc.,* 15 *Ill. App.* 2d 57,
145 *N. E.* 2d 377, 66 *A. L. R.* 2d 1075 (*App. Ct.* 1957) bears
upon our problem. Hayes Freight Lines was an I.C.C. fran-
chised motor carrier. It had leased a tractor for exclusive
use in its business. Under the agreement the lessor drove the
tractor in the carrier's operation, and he is described in the
opinion as its employee. Upon completing a 350-mile trip

on the day of the accident he returned to the carrier's lot after 11:00 P.M. That particular transportation assignment was ended then, and he had not been given any trip for the following day. However, his instructions were to telephone in to ascertain his next job. Under I. C. C. regulations he was required to have eight hours rest before the next trip. His home was many miles away. He detached this tractor from the trailer, left the lot and started down the highway in the direction of a motel where he had stayed previously. The motel was about a mile and a half away, and as he was turning left into its driveway he was involved in a collision with another truck, as a result of which the suit in question arose. The carrier was held responsible for his negligence, the court saying that even though his work assignment had terminated for the day, he was still conducting himself within the framework of the I. C. C. rules. This opinion appears to conflict with *Schmidbauer v. Ballimore & Pittsburg Motor Exp. Co.*, 228 *Md.* 637, 181 *A.* 2d 325 (*Ct. App.* 1962) on which defendant here places substantial reliance. In our judgment *Turnbow v. Hayes Freight Lines* represents a sound and more just result. *Cf. Felbrant v. Able*, 80 *N. J. Super.* 587 (*App. Div.* 1963).

The Court of Appeals for the Third Circuit dealt with a similar problem in *Mellon Nat'l Bank & Trust Co. v. Sophie Lines, Inc., supra.* On September 24, 1955 Sophie Lines, a non-franchised trucker leased its truck and driver under a 30-day written lease to Turner Transfer, Inc., a licensed I. C. C. carrier with operating permits limited to the carrying of certain knitting equipment in fixed areas. Turner decals were then placed on the truck and a copy of the lease was carried in it as required by the regulations. On September 29, 1955 the truck left Reading, Pennsylvania, with half a knitting machine to be delivered at Concord, North Carolina. On the way the driver stopped at Greensboro, North Carolina, to arrange with the Turner dispatcher at that station for riggers to be on hand at Concord. The dispatcher instructed him that after unloading at Concord he should

proceed to Henderson, North Carolina, a terminal for Sophie Lines and remove the Turner Transfer decals since there was no immediate need of the truck. Upon completion of the unloading at Concord the truck was driven to Henderson, as directed, and the driver advised the Sophie Lines' secretary that Turner had no present use for the vehicle. The secretary then ascertained that the Taylor-Thayer Lumber Company, a local corporation, needed a truck to haul some lumber to Elizabeth, Pennsylvania. The Turner Transfer truck and driver were then dispatched with the lumber. The Turner decals which read "Leased to Turner Transfer Inc.," were not removed as had been directed by the Turner dispatcher. Nor was the receipt obtained which the I. C. C. regulations require when the possession of the carrier ends. Turner's franchise did not permit the carrying of lumber in interstate commerce; it was not informed of the trip, and was not to receive any part of the revenue therefrom. Sophie Lines having no I. C. C. franchise had no authority to engage in such interstate transportation on its own. Turner Transfer, however, knew that on previous occasions in order to avoid an empty trip or deadhead, Sophie Lines had used its truck and driver to haul lumber for Taylor-Thayer. Turner profited from that practice whenever a truck carried a load of lumber while enroute to pick up Turner freight. In such instances the Sophie Lines mileage charge against it for an empty truck was eliminated. (Sophie Lines was later convicted of violating I. C. C. regulations in making these unauthorized trips for the lumber company.) During this particular trip to deliver the lumber, the truck was involved in an accident in Pennsylvania which resulted in damage actions against Sophie Lines and Turner Transfer. Noting that its decals were still on the truck at the time of the accident, the trial court held Turner liable as a matter of law and declined to submit the issue of its liability to the jury. The Court of Appeals affirmed rejecting the contention that the nature of the actual operation at the time of the mishap

created a jury question as to whether Turner was responsible for the negligence of the driver.

The court said that one of the principal purposes, if not the primary purpose, of the I. C. C. regulations is the protection of the traveling public on the highway. It approved the declaration of liability even though Turner was not aware of the lumber carriage to Pennsylvania, had no legal authority under its franchise to transport lumber in interstate commerce, and had no direct interest in the revenue to be charged therefrom. The court pointed out that the accident occurred during the 30-day term of the Sophie Lines-Turner lease and that under the regulations Turner had assumed exclusive possession, control and use of the equipment and full responsibility with respect to it for that period. Judge McLaughlin speaking for the court said Turner "could have effectually eliminated its responsibility for the truck's use in only one way," removing its decals and its name as the operator from the truck, and obtaining the receipt from Sophie Lines acknowledging return of possession to it from Turner. 289 *F. 2d,* at *p.* 476. The stipulation of the parties that Turner had told its driver to remove its name and decals from the truck at the Sophie Lines' Henderson terminal, and that he had failed to do so was not considered sufficient to establish a jury question as to whether the truck was engaged in Turner's authorized operation at the time of the collision. The continued presence of the decals and copy of the lease were regarded as creating a conclusive presumption that the truck was being operated on Turner business.

Bond attempts to distinguish the *Sophie Lines* case because the Turner tractor was in the course of an interstate trip when the accident happened. The interstate aspect may appear to make the case a stronger one than ours for the imposition of liability on the carrier. But if the lumber were being transported wholly intrastate and not to Pennsylvania, we do not believe a judgment for the defendant as a matter of

law would have been required or ordered. At most, the different circumstance would have resulted in a jury question as to whether under the course of conduct shown, Turner was receiving an incidental benefit from the intrastate journey within the scope of the regulations.

In *Leotta v. Plessinger, supra,* the New York Court of Appeals faced a somewhat similar situation. On November 15, 1956, Riggs Dairy Express Inc., an I. C. C. certificated carrier, entered into a written one-trip lease with the owner of a tractor, who also furnished the driver, Plessinger.[1] The agreement was for the carriage of an I. C. C. regulated cargo from Chicago, Illinois, to Somerville, Massachusetts. Upon arrival at the Somerville truck terminal, Plessinger unloaded his truck which bore Riggs' identification decals, and then in accordance with instructions called Riggs at Chicago to report the delivery. Since no return load was available, he proceeded, pursuant to Riggs' general manager's suggestion (given a year earlier but not made on this occasion), to a cargo broker's place of business at Avoca, New York. There being no return load available at that place, Plessinger detached the trailer and secured lodgings in Bath, New York (nearby Avoca). Two days later, while returning to the broker's place in the tractor he was involved in the accident which eventuated in the damage action. The trial court found a jury question as to Riggs' responsibility and plaintiff obtained a verdict. The Appellate Division reversed, holding that the contract between Riggs and Plessinger's employer was a one-way lease which had been fully performed five days prior to the accident at which time Plessinger was solely Holle's (the tractor owner's) employee.

The Court of Appeals disagreed with the Appellate Division. It referred to the grave concern of Congress over

---

[1] At this time *Section* 1057.4(*a*)(3) providing that trip-leases "shall be not less than 30 days" was not in effect. *Subsection* (*a*) (6) specified (as it still does) that "The duration * * * shall coincide with the time for the giving of receipts for the equipment" under *subsection* (b), which requires the carrier to obtain a receipt

abuses and exploitation of trip-leasing, and the adoption of regulations by the Interstate Commerce Commission in order to provide safeguards and to delineate responsibility following an accident. Under these regulations, the court said, the leasing carrier assumed exclusive control and use of the equipment and the responsibility therefor; also it was obliged to "properly and correctly" identify the equipment for the period of the lease, and at the end thereof to remove the identification and obtain a receipt showing relinquishment of possession to the lessor. After pointing out that the decal, copy of the lease and the unsigned receipt were still with Plessinger when the mishap occurred, and that it was customary for them to remain until the truck came to the home station, the court said:

"* * * Riggs acquiesced in a violation of the express mandate of the regulations which provide for the proper method to relinquish possession. Since Riggs seemingly failed to comply, or take any serious steps to assure compliance, it does not seem unreasonable to leave the question of liability to a jury." 209 N. Y. S. 2d, at p. 309, 171 N. E. 2d, at p. 457.

It was declared further that the mandate of the regulations was not delegable to Plessinger, and that as a matter of law Riggs was in possession and control and, therefore, must assume responsibility. The opinion likened the truck bearing Riggs' identifying decal to a flag which proclaims the nationality of the ship flying it. The court suggested that the carrier might introduce evidence to show that the identifying trappings were camouflage or innocent coincidence, or that the driver ignored instructions in failing to remove the decal; but "such explanations are for the jury to· evaluate and appraise in the light of all the surrounding circumstances." 209 N. Y. S. 2d, at p. 310, 171 N. E. 2d, at p. 458. Judge Desmond in concurring expressed the view that as a matter of law the I.C.C. regulations fix absolute liability upon the

from the lessor-owner or his employee showing relinquishment of possession by· the· carrier.

carrier until it has relinquished possession as required and has caused the identifying insignia to be removed. 209 *N. Y. S. 2d* 304, 171 *N. E. 2d,* at *p.* 460.

In *Rosu v. Law,* 193 *F. 2d* 894 (3 *Cir.* 1952), Law, the owner of a tractor, was engaged under written lease by Blue Star Foods, Inc. to haul a load of frozen eggs in Blue Star's trailer from Council Bluffs, Iowa, to Sunbury, Pennsylvania. He was to be paid for both the outgoing and return trips. In addition he had permission to seek a return load, the revenue therefrom to go to Blue Star. Law made a delivery in Sunbury and then one in New York. Being unable to locate a return load, he drove to Philadelphia with that purpose in mind. Then he fortuitously learned at a truck stop that the Liberty Motor Freight Lines, Inc. had a customer located on the outskirts of Wilmington, Delaware, which desired some merchandise taken to Kansas City, Missouri. Law agreed with Liberty to transport it. During an afternoon conversation with the Liberty dispatcher, Law was told to come to the office (some three or four miles from the truck-stop) that evening and obtain various necessary papers in connection with the shipment. This was to enable Law to be at the customer's plant in Wilmington early the next morning before the Liberty office opened, and to expedite the 1,300-mile trip to Kansas City. That evening Law went to the office in his tractor, which he had detached from the trailer, signed the lease covering his equipment and the manifest, both dated the next day. He was then given a Liberty I.C.C. sticker for his tractor. On leaving the office he intended to drive the tractor back to the truck stop, re-attach the trailer and start for the customer's plant, in order to be sure to arrive there early in the morning to pick up the load. On the way back to the truck stop he was involved in a fatal accident. Liberty argued that Law's operation under its I.C.C. license did not commence until the next morning when he picked up the load at the customer's plant. In view of the circumstances and particularly Law's

possession of the I.C.C. sticker, the trial court held that the jury could find that at the time of the accident the tractor was being operated under the Liberty franchise. The Third Circuit Court of Appeals affirmed. 193 *F. 2d* 894. (3 *Cir.* 1952) It is to be noted that this case was decided before the advent of the present *Section* 1057.4 of the Commission's regulations.

In *National Trailer Convoy, Inc. v. Saul,* 375 *P. 2d* 922 (*Okl. Sup. Ct.* 1962) one Wix, owner of a tractor, made a one-year lease to haul trailers of National Trailer Convoy, Inc., an I.C.C. licensee. The regulations of the Commission were incorporated therein by express reference. Pursuant thereto Wix hauled a trailer from National's establishment in Tulsa, Okla., to Abilene, Tex. He delivered the trailer and detached his tractor to return to Oklahoma. On the return trip he was carrying the money he had collected for National for hauling the load. He did not reach Tulsa until long after the office had closed for the night. Consequently he could not turn the money in, nor could he obtain the receipt called for by the I.C.C. regulations to show termination of the hauling assignment. Under the arrangement with National he was free to and customarily did, drive the tractor to and from his home, and he drove it on National's business at any hour of the day or night he chose, with a certain exception not material to the litigation. Apparently he intended to spend the rest of the night at his home in Claremore, Okla. Somewhere either in Tulsa or along the way he had some drinks. He drove off the turnpike at the Claremore interchange, but, according to his testimony, after doing so he remembered his wife's opposition to his drinking. He then turned around and drove through the tollgate toward Tulsa, intending to drive to a place along the turnpike where he could park the truck and sleep in it until morning when he would again start for home. After driving a short distance, he stopped on the turnpike, turned off the lights and did not put out a signal or flare to warn motorists

of the tractor's presence. Some time later a motorist collided with the rear of his vehicle and was fatally injured. His widow obtained a verdict against Wix and National. At the trial National argued unsuccessfully that at the time of the accident all of its business with Wix had been concluded, and that he could no longer be considered its employee. The Supreme Court affirmed the trial court saying that under the circumstances, including the fact that Wix had not yet "checked in" with the company "off the Abilene trip, nor in any other formal, bilateral, or contractual manner terminated his engagement for National under the parties' contract * * *, the evidence as a whole was sufficient to go to the jury for determination of the question as to whether or not, at the time of the accident, Wix was the agent, and still employed in business, of National, as comprehended in the parties' agreement * * *." 375 *P. 2d*, at 927.

We regard Judge Kilkenny's opinion for the Appellate Division in *Felbrant v. Able*, 80 *N. J. Super.* 587 (*App. Div.* 1963) as sound and substantially expressing the conclusion we have reached in the present case. Able, owner of a tractor-trailer executed a written lease of the equipment to Service Transport Company, an I.C.C. carrier. The lease provided, as required by the regulations, that for its duration the equipment would be in the exclusive possession, use and control of the carrier (which was given the right to halt the movement of the vehicle), that the carrier's decal and legend would be displayed on it, and that when the services were completed the identification markers would be removed completely. Service Transport Company owned and operated eleven freight terminals, two of them being at Norristown, Pennsylvania, and Parma, Ohio. Its transportation business covered seven states. Able's "domicile" terminal was considered to be Norristown, Pennsylvania, because he lived relatively nearby in Pottstown, Pennsylvania, and he customarily reported at Norristown. He would be given an assignment there and upon its completion would call the nearest

Service Transportation terminal for another. If there was no load available he would "be taken off duty." Then he could remain in the area and wait for work or he could voluntarily return home. If the last delivery was in the "domicile" area, upon its completion he would drive his tractor-trailer to his home in Pottstown. On arrival home he would call the Norristown dispatcher and report his availability for another trip. There was no prohibition against his going home. He could do so at any time if there was no work for him, so long as he reported his intention to go home. On being given an assignment he would drive from home to the pick-up point and then proceed to the place of delivery. His compensation was a percentage of the charges collected by Service Transportation for the trips he made.

Around September 9, 1960, upon receiving instructions from the dispatcher, Able left home, drove to the Norristown terminal, picked up a load of freight and delivered it to Parma, Ohio. Then he carried a second load from Parma to the Port Newark terminal, at Newark, New Jersey. Upon completion of the unloading at Newark he was informed by the Norristown dispatcher that there were no further work assignments at the time. Able then requested and was granted permission to go "off further service" in order to allow him to return directly to his home in Pottstown, about 20 miles from the Norristown terminal, so he could attend his ailing wife. While on Route No. 1 in Elizabeth, New Jersey, on his way home, he collided with another vehicle. At this time the Service-Able lease was still in existence and the decal was still on the tractor-trailer, although it was easily removable. In the ensuing litigation Service maintained that its vicarious liability under the I.C.C. regulations for the negligence of an independent contractor-lessor did not exist unless the lessor-operator was engaged in interstate commerce and on the carrier's business. It contended further that since Able was engaged at the time on a personal mission not related to its authorized transportation activity, it had no responsibility as a matter of law.

The trial court entered summary judgment for the carrier but the Appellate Division reversed. It pointed out that Able's return trip empty from Port Newark instead of remaining until another load was available either there or at some other terminal was authorized by Service. And it was immaterial that the journey from Port Newark to Pottstown was without compensation or that it was with permission of the carrier to serve some personal purpose. Judge Kilkenny referred with approval to the portion of the opinion in *Mellon Nat'l Bank & Trust Co. v. Sophie Lines, Inc., supra,* 289 *F. 2d,* at *p.* 473, which declared that the carrier's responsibility could have been eliminated only in one way, *i. e.,* removing the decal from the equipment and obtaining the required receipt evidencing surrender of the leased equipment to the lessor. Accordingly the summary judgment was reversed and the matter remanded for full development of the facts at a plenary trial.

In our judgment the result would have been no different if Able had returned to the Norristown terminal and went off duty at that point for his personal mission. In that event if the accident occurred during his intrastate trip home to Pottstown to care for his ailing wife, the presence of the I.C.C. decal on his equipment would still create, at least, a jury question as to whether he was engaged in Service Transportation's business. After Able arrived home and took care of his personal business he was obliged to telephone the dispatcher, just as McCaskill was, and advise that he was available for an assignment. In fact in Able's situation the time when he could be ready for work was somewhat indefinite because of his wife's illness. This contrasts with McCaskill's obligation which was to hold himself and his tractor in readiness for the next assignment which would come to him over the telephone either on the night of the accident or over the weekend.

Thus, under the circumstances of the present case and the authorities to which we have alluded, in our view it cannot

be said as a matter of law that McCaskill's journey home flying Bond's flag so far removed him from the area of the carrier's authorized activity as to require the entry of judgment for the defendant. On the contrary, the issue must be regarded as a factual one for jury determination.

The broad general language employed by the trial court in its charge in presenting the factual issue to the jury for decision, *i. e.* whether McCaskill was engaged at the time of the accident in carrying on the activity of Bond, we feel was sufficient to meet defendant's sole objection that liability could not be found against it unless the tractor was on an interstate mission in its behalf. That contention phrased in variant ways in Bond's brief must be rejected as a basis for reversal. Nor do we find any substance in the argument that submission of the case to the jury on the issue of defendant's liability violated Article I, Section 8, the Commerce Clause, or the Fourteenth Amendment of the United States Constitution.

Accordingly the judgment of the Appellate Division is reversed and the judgments in the trial court in favor of the plaintiffs are reinstated.

HALL, J. (concurring). Whether in a particular factual complex, the Motor Carrier Act and subsequent regulations of the Interstate Commerce Commission impose vicarious liability upon a trucking company-lessee of a motor vehicle for the negligence of the lessor-driver, an independent contractor, is actually a question of federal law, though very frequently, as here, one for determination by a state court. Since the United States Supreme Court has not spoken definitively in this area, the proper approach for a state tribunal is to seek conformity with the broad spirit and purpose of the federal enactments, which are fully spelled out in the majority opinion.

Here the dispositive facts are, in my view, uncontradicted, or at the least, are in such an evidential posture that reasonable men could not differ as to them and the conclusions to be

drawn therefrom. Hence, the trial judge, as a matter of law, should have granted plaintiff's motion for a binding instruction to the jury that Bond Transportation was vicariously liable if it found the driver negligent. Since the jury's finding that the driver was negligent is not challenged and no other prejudicial error appears, I would reverse the Appellate Division and affirm the trial court judgment on this basis. The question raised by Bond as to the correctness of the special interrogatory put to the jury on the issue of vicarious liability and the judge's instructions with respect to its resolution would thereby become academic. To decide, as the majority does, that the issue was one for jury determination in this state of the proofs can only lead to confusion in future cases.

The operative facts are admittedly different from those in most prior state and federal court cases dealing with the question. In those decisions the accident happened while both the vehicle and the lessor-driver were or had been away from the home state preceding, following, or during a gap in, interstate transportation. Here, on the other hand, the accident was in no way connected with an interstate transportation. On the day in question, and, in fact, on all but one previous occasion during the lease period, the hauling was entirely within the State and the mishap occurred while the lessor was driving his tractor home from Bond's terminal (both locations being in New Jersey, a few miles apart) after the day's work, with the expectation of a similar assignment the next working day. But I do not believe that such a factual distinction precludes a legal conclusion of vicarious liability under the current federal regulations. The same conclusion must also be reached with regard to Bond's even broader contention that liability cannot be imposed unless, at the moment of the accident, the vehicle was actually engaged in interstate commerce.

Furthermore, I do not deem it significant that a 30-day minimum written lease, which is required by the Com-

mission's regulations, had not been executed; there can be no dispute that, in legal effect, an oral lease existed covering Bond's use of the tractor during the winter heating season. Vicarious liability cannot be avoided simply by absence of a written instrument for at least the minimum period in evasion of the law. Trip leases being now forbidden, the case must be viewed as though the requisite written engagement had been entered into.

The dispositive facts in this case, as I see it, are Bond's furnishing a decal (in one form or another) to the lessor-driver bearing its Interstate Commerce Commission franchise number, and the continuous attachment of a decal to the leased tractor at Bond's direction. Although the testimony is confusing in some respects, viewing it most favorably to Bond indisputably demonstrates that this is so. Photographic evidence establishes beyond doubt that the cardboard decal, at least, was on the tractor at the time of the accident; and there is no evidence that the lessee at any time had ordered its removal. It is to be observed in this connection, that, clearly, a decal is not required by any federal regulation to be affixed where the leased vehicle is to be and is in fact employed only for intrastate transportation. Moreover, Bond's contention that its name was required on the tractor by the New Jersey motor vehicle law is erroneous. *N. J. S. A.* 39:4–46 demands only that the name and municipality of residence of the owner, lessee, *or* lessor appear on a vehicle. Here the photograph shows that the owner-lessor's identification was already painted on the cab.

I would hold that the decal conclusively evidenced Bond's intention to have the vehicle available and under its exclusive control for the entire lease period for interstate as well as intrastate transportation, and that Bond should not now be able to claim otherwise. This being so, the federal enactments must apply throughout, and Bond is required thereby to assume full responsibility to the public for the operation

of the vehicle. Vicarious liability for this accident consequently attaches as a matter of law. This conclusion best comports, I believe, with the spirit and purpose of these enactments and is supported by the rationale of the better considered opinions in this field. See particularly *Mellon National Bank & Trust Co. v. Sophie Lines, Inc.*, 289 F. 2d 473 *(3rd Cir.* 1961), where, although the accident occurred on an unauthorized return trip digression following an interstate hauling, the court decided that the only way the lessee could have avoided responsibility was by conforming to the specific requirements of the regulations, which mandated the removal of its decal before relinquishing possession of the equipment and the obtaining of a receipt for the vehicle from the owner. Not having done so, the lessee was held vicariously liable as a matter of law. See also *Leotta v. Plessinger,* 8 *N. Y.* 2d 449, 209 *N. Y. S.* 2d 304, 171 *N. E.* 2d 454, 460 (1960) (concurring opinion of Desmond, C. J.); *Turnbow v. Hayes Freight Lines, Inc.,* 15 *Ill. App.* 2d 57, 145 *N. E.* 2d 377, 380, 66 *A. L. R.* 2d 1075 *(App. Ct.* 1957); *Felbrant v. Able,* 80 *N. J. Super.* 587, 590 *(App. Div.* 1963).

If more on the question of Bond's intention is required, it is found in the one interstate trip undertaken by the lessor-driver during the period. Whether that hauling was Bond's job conducted under cover of another's franchise, or was the job of the other and Bond subleased the equipment, Bond's intention to have the leased vehicle available for interstate transportation is clearly evident.

Additionally, it is to be noted that the ill-fated trip from the terminal to the lessor's home, in accord with a frequent practice and with Bond's full knowledge and acquiescence, was in the latter's business interest by assuring the lessor-driver's availability at the terminal for the next early morning assignment. *Cf. Wright v. Globe Porcelain Co.,* 72 *N. J. Super.* 414 *(App. Div.* 1962); *Prosser, Torts (3rd Ed.* 1964), § 69; 2 *Harper and James, Law of Torts* (1956). § 26.7, *p.* 1378.

It may be added that at the trial, and in the appellate briefs as well, all counsel were of the view that the question of vicarious liability was a matter of law, one way or the other, and not a fact question for jury determination. The trial judge was of the same mind, but felt that *Felbrant v. Able, supra,* dictated otherwise. I cannot so read that opinion.

I concur in the result reached by the majority.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN. — 7.

*For affirmance* — None.