767 P.2d 254

Leonard **HARVEY** and Vesta Harvey, husband and wife; Donald Wells and Charlene Wells, husband and wife, Plaintiffs–Respondents,

v.

**F–B TRUCK LINE COMPANY,** Defendant-Appellant,

and

**Charles MacGuinnis,** Defendant.

No. 16060.

Supreme Court of Idaho.

July 16, 1987.

On Denial of Rehearing June 9, 1988.

On Rehearing Feb. 9, 1989.

---

Westberg & McCabe, Chtd., Boise, for defendant-appellant. Paul Larry Westberg, argued.

James A. Bevis, of the firm Manweiler, Bevis & Cameron, Boise, for plaintiffs-respondents.

BISTLINE, Justice.

The underlying facts and procedural background of this lawsuit were well stated by the district court, the Honorable Ray Durtschi, in a memorandum decision written to formalize a verbal ruling from the bench. The ruling came after hearing argument on the Harveys' motion for a judgment n.o.v. or, alternatively, for grant of a new trial:

A brief outline of the nature of the action and its history will serve to clarify the issues posed by the Motion.

The action arose out of a collision between an automobile in which plaintiffs were riding and a truck-trailer combination which defendant Charles MacGuinnis was operating at the time of the collision.

Plaintiffs joined F–B Truck Line Company as a defendant on the theory that before the collision, F–B had acquired the use of the truck and trailer under lease terms that required the truck and trailer to be operated for F–B by Charles MacGuinnis. In a pretrial summary judgment motion I determined that F–B could not be held liable under the common-law doctrine of respondeat superior. I determined, however, that genuine and material issues of fact existed as to whether F–B could be held liable as a statutory employer under I.C.C. regulations governing the leasing of transportation equipment to perform transportation under a regulated carrier's I.C.C. permit (49 CFR Parts 1057 and 1058). Since the issues as to F–B's potential liability under this theory were almost entirely unrelated to the facts of the accident, I bifurcated the trial as to fault

and damages from the trial as to F–B's status as a statutory employer. The latter issue has been tried, and the judgment rendered on the jury verdict is the basis of the subject motion.

Since at best the issues under the statutory employer theory were somewhat complex for a jury trial, and it appearing to me that it was not a proper function of the jury to interpret the applicable I.C.C. regulations, the case was submitted to the jury under special interrogatories which required the jury to determine the basic facts which would enable the Court to apply the regulations to those facts as a matter of law. This approach avoided burdening the jury with a long recitation of the applicable regulations. As the basis for this approach I accepted as a threshold proposition that as a matter of law the burden was on the plaintiffs to establish through the jury's findings basic facts from which the Court could conclude as a matter of law that F–B, as a regulated carrier, had leased the equipment involved in the accident and engaged Charles MacGuinnis as a driver. I also accepted as a correlative principle of law that the burden was on F–B as a regulated carrier, once it undertook to lease equipment, to comply with the regulations governing the leasing of equipment and the termination of such lease unless it could establish that it was exempt from the regulations. It was my conclusion that F–B did not attempt to establish that it was exempt from the pertinent regulations; therefore no issue was submitted to the jury as to possible exemptions. It followed as a matter of law from the foregoing propositions that if the equipment in question was leased by F–B it was no defense that F–B did not enforce compliance with the regulations either as to the formalities required for the leasing of the equipment or as to the termination of the lease (*Cox v. Bond Transportation, Inc.*, [53 N.J. 186] 249 A.2d 579 (N.J.1969); *Schedler v. Rowley Interstate Transp. Co.*, [68 Ill.2d 7, 11 Ill.Dec. 541] 368 N.E.2d 1287 (Ill.1977); *Rodriguez v. Ager*, 705 F.2d 1229 (10th Cir.1983); *Simmons v. King*, 478 F.2d 857 (5th Cir.1973)). R., pp. 199–201.

F–B's appeal requires us to address the following issues:

(1) Whether there was substantial, competent evidence to support the findings of the jury that

(a) James Barnes was an agent of F–B on March 28, 1980, and

(b) It was within the scope of James Barnes' authority as an agent of F–B to acquire the use of equipment and an operator to haul freight under F–B's ICC permit.

(2) Whether the trial court committed reversible error in granting the Harveys' motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.

(3) Whether the trial court committed reversible error in concluding that the applicable ICC regulations fix financial responsibility, as a matter of law, upon F–B for accidents occurring during trips conducted under F–B's ICC permit.

We affirm on issues 1 and 3, reverse the grant of a judgment n.o.v., and remand for a new trial.

## I.

Finding that the case presented somewhat complex issues for a jury trial, the district judge submitted the matter to the jury under special interrogatories. The interrogatories required the jury to determine basic facts enabling the court to apply the ICC regulations to those facts as a matter of law. The two interrogatories here at issue, Instructions Nos. 15 and 16, were framed as follows:

### INSTRUCTION NO. 15

Question No. 1: Was James Barnes an agent of F–B Truck Line Company on March 28, 1980?

If you answered Question No. 1 "yes", then answer Question No. 2.

### INSTRUCTION NO. 16

Question No. 2: Was it within the scope of James Barnes' authority as an

**414**

agent of F–B Truck Line Company to acquire the use of motor transportation equipment owned by another to transport property under F–B's I.C.C. permit and to engage the person from whom the equipment was acquired to operate such equipment for F–B?

If you answered Question No. 2 "yes", then answer the next Question. R., p. 159–60.

F–B asserts that the evidence was insufficient to support the jury's affirmative answers to the questions above. The standard of review of a jury verdict is well-settled:

Our function is to decide whether a jury reasonably could have found as did the jury in this case. We will not disturb jury verdicts supported by substantial and competent evidence, even though we entertain doubt as to which party's version of the conflicting facts is more probable. *Challis Irrigation Co. v. State,* 107 Idaho 338, 348, 689 P.2d 230, 240 (Ct.App.1984) (on rehearing).

The Harveys direct our attention to numerous portions of testimony which supplied substantial evidence to support the jury's finding that Barnes was an agent of F–B acting within the scope of his authority. Barnes was employed by Robert Martin who managed the truck stop. F–B was in the business of trip-leasing trucks from 1300 independent owner/operators in 1979–80 and needed field agents such as Martin to sign leases on their behalf. Tr., pp. 44–45, 48.

In September, 1979, Fred Johnson, a commissioned agent for F–B, discussed with Martin and Barnes the possibility of arranging for Barnes to sign trip leases since Martin was not at the truck stop 24 hours a day. Tr., pp. 70–71. Johnson said it was necessary for Barnes to sign a signature sheet that would authorize Barnes to write and sign F–B trip lease. Tr., pp. 72, 208. A sheet was obtained from Salt Lake City, Utah, which Barnes signed and returned. Tr., p. 207 Barnes, *in fact,* wrote trip leases for F–B. Tr., p. 208.

Martin's agent's agreement with F–B required him to employ enough staff to properly operate and maintain the truck stop as, in part, a field office for F–B. F–B's agent and dispatcher, Paula Chamberlin, coordinated the load and assignment to MacGuinnis and provided company information to Barnes necessary to fill out the trip lease here at issue. Tr., pp. 123, 126, 129. Martin testified that Barnes was authorized to sign leases and that he instructed Barnes in the manner of filling out the lease paperwork. Tr., p. 166.

■ The above is by no means all the evidence which supports the jury's answers to interrogatories Nos. 1 and 2 reproduced above. However, it is certainly sufficient to demonstrate that the jury had a reasonable basis for its findings.

II.

Issue No. 2 arises out of the jury's response to Special Interrogatory No. 3 reproduced below:

INSTRUCTION NO. 17

Question No. 3: Did James Barnes before the accident on March 28, 1980, acquire the use, for F–B Truck Line Company in transporting property under F–B's I.C.C. permit, of the truck and trailer operated by Charles MacGuinnis at the time of the accident and engage Charles MacGuinnis to operate such equipment for F–B?

If you answered Question No. 3 "yes", then answer Question No. 4. R., p. 161.

The jury answered this question "no." In his memorandum opinion, Judge Durtschi explored at length the jury's negative answer to Interrogatory No. 3:

But for one discrepancy in the evidence, affirmative answers to Interrogatories 1 and 2 should have almost automatically compelled an affirmative answer to Interrogatory No. 3. That discrepancy involved evidence of a difference in the make of trailer which was acquired for F–B's use in the transaction between Barnes and MacGuinnis and the make of trailer involved in the accident. Barnes identified the make of the trailer acquired for the use of F–B as a "1977

Trailmobile," while the owner of the trailer involved in the accident, Ray Montgomery, said it was a "Beale" trailer. It is clear that the jurors were concerned about this discrepancy by the following question which they sent to the court during their deliberations:

"Your Honor, Are we to accept the truck & trailer as one unit or consider that there is a discrepancy in the description of the trailer & the actual trailer involved at the time of the accident."

After discussions between Court and counsel, both in chambers and on the record as to the jury's question, it was agreed by counsel that the Court should give a written response to the question, but counsel disagreed as to what that response should be. The Court, over objection by counsel for plaintiffs, adopted the response proposed by Counsel for F–B. That response was as follows:

"This subject is covered by the instructions and in particular Instruction No. 17, which is Question No. 3."

That response was in accord with the Court's position at all times that the truck and trailer had to be treated as a unit, since it was obvious that F–B could not haul its load of freight from Spokane to Phoenix with a tractor alone, and whatever aquisition of equipment was made on behalf of F–B on March 28, 1980, was a tractor and trailer as a unit. Furthermore, such combinations come within the definition of "equipment" under the I.C.C. regulations (49 CFR 1057.-2(b)).

It is obvious to me from the foregoing considerations that the basis of the jury's negative answer to Interrogatory No. 3 was the discrepancy in the designation by Barnes of the make of trailer acquired for F–B by Barnes and the designation by Montgomery of the make of trailer involved in the accident. R., pp. 203–04.

The judge found that the different descriptions of the trailer by Barnes and Montgomery did not, standing alone, compel the conclusion that different trailers were involved. In addition, MacGuinnis would have needed a motive and a means of accomplishing the "double-switch":

The evidence is ... uncontradicted that the lease transaction between Barnes and MacGuinnis took place later that day at around 3:00 p.m. at the Stinker Station. This is the time that Barnes identified the trailer as a 1977 Trailmobile on Exhibit 13. If the trailer MacGuinnis presented at the Stinker Station was not the Montgomery trailer, the conclusion is inescapable that MacGuinnis had switched trailers between noon when he picked up Montgomery's trailer, and 3:00 p.m. on March 28, 1980, when he appeared at the Stinker Station. The evidence is also uncontradicted that at approximately 7:30 p.m. of that same day, when the accident occurred, MacGuinnis again had Montgomery's trailer. If this was not the same trailer presented at the Stinker Station, the further conclusion is inescapable that MacGuinnis had again switched trailers between 3:00 p.m. and 7:30 p.m. by dropping the trailer he presented at the Stinker Station and again picking up the Montgomery trailer. The record is totally silent as to why the supposed two switches were made, when they were made, where they were made, or where the phantom Trailmobile trailer came from or what happened to it. It seemingly appeared at the Stinker Station from nowhere and thereafter disappeared, never to be seen again so far as this trial record is concerned. R., pp. 206–07.

The Harveys responded to the jury's negative answer with a timely post-trial motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial. R., p. 196. The trial judge gave this motion careful consideration, R., pp. 202–08, and granted a judgment n.o.v., R., pp. 197–98. At the same time, Judge Durtschi denied all other post-trial motions, R., p. 197, 211. Presumably, this denial included the Harveys' alternative motion for a new trial, although the record discloses no such express and specific denial.

The trial court made its ruling without the benefit of our most recent thinking on the subject. *See Quick v. Crane*, 111 Ida-

ho 759, 727 P.2d 1187 (1986). There, as here, the moving party framed its motion in the alternative and based it, in part, on the ground that the evidence was insufficient to sustain the jury's verdict. R., p. 202. *Quick, supra,* 111 Idaho at 766, 727 P.2d at 1194.

The pertinent portion of *Quick,* which supplies the guidelines for our decision today, is reproduced below:

Idaho Rule of Civil Procedure 59(a)(6) permits the trial court to grant a new trial on all or part of the issues in an action by reason of the "[i]nsufficiency of the evidence to justify the verdict or other decision, or that it is against the law." It is well established that the trial judge may grant a new trial based on I.R.C.P. Rule 59(a)(6) where, after he has weighed all the evidence, including his own determination of the credibility of the witnesses, he concludes that the verdict is not in accord with his assessment of the clear weight of the evidence. *Sheets v. Agro-West, Inc.,* 104 Idaho 880, 883, 664 P.2d 787, 790 (Ct.App.1983).

As was done in this case, a motion for a judgment n.o.v. may be joined in the alternative with a motion for a new trial in conformance with the requirements of Rule 59(a). I.R.C.P. 50(b). However, the two motions have wholly distinct functions and different standards govern their allowance. Wright & Miller, *supra* § 2531 at 571. Unfortunately, some courts have confused the two standards and have persisted in stating as the standard for judgment n.o.v. the much more lenient test that is applicable to a motion for a new trial on the ground that the verdict is against the weight of, or is not justified by, the evidence. *Id.* Because of the finality of a judgment n.o.v.—*i.e.,* the parties are not given the opportunity to try the case again—it is measured by a far more rigorous standard than is a motion for a new trial.

*On a motion for a new trial, the court has broad discretion. On a motion for directed verdict or judgment n.o.v., it has no discretion and must consider only the question of law whether there is sufficient evidence to* raise a jury issue. Id. *On a motion for a new trial the court weighs the evidence and the credibility of the witnesses. On a motion for a directed verdict or for judgment n.o.v., it does not. Id.* Quick, supra, *111 Idaho at 766, 727 P.2d at 1194 (emphasis added).*

The problem created by the manner in which the trial judge dealt with the motion for a judgment n.o.v. is this—he did precisely that which *Quick* forbids; he weighed the evidence and the credibility of the witnesses. A brief reference to the concluding paragraphs of the trial court's memorandum opinion on this issue is sufficient to demonstrate that the court, without the benefit of *Quick,* went astray:

MacGuinnis traced his actions from the time he picked up the Montgomery trailer to the time of the accident and no switching of trailers was involved in that testimony. *Even recognizing that the jury may have had legitimate questions about the general level of credibility of MacGuinnis' testimony,* there is nothing in the record to suggest any motive to switch trailers or to fabricate this part of his testimony.

From the evidence just summarized it is clear that the conclusion that MacGuinnis switched trailers twice between noon and 7:30 p.m. on the day of the accident must rest on the slender thread of an uncorroborated assumption that a means of accurate identification of the make of trailer was available to both Barnes and Montgomery and that each had the ability by that means to identify accurately the make of the trailer, plus pure speculation as to the circumstances and reason for the switching. *A finding much more consistent with the total evidentiary record is that Barnes was simply mistaken in his identification of the make of the trailer. Hence, I conclude that the jury's finding in answer to Question no. 3 is not supported by substantial evidence and in fact is contrary to the great weight of the evidence. I find that the great weight of the evidence supports an affirmative*

*answer to Question No. 3.* R., p. 207 (emphasis added).

Therefore, since the court applied an incorrect standard, its grant of the judgment n.o.v. cannot stand. Somewhat more troublesome is the question of what this court on appeal can or should do under the circumstances. For a comprehensive discussion of the complications which an appellate court faces when reviewing alternative motions for judgment or for a new trial, *see* 9 C. Wright & A. Miller, *Federal Practice & Procedure*, § 2540, pp. 611–21 (1971 & Supp.1986).

Here, the trial judge apparently denied the motion for a new trial, and yet when ruling on the motion for judgment n.o.v. applied precisely the correct standard for granting a new trial. In addition, the Honorable Ray Durtschi has now retired from the bench. Therefore, the case cannot be remanded to him for further consideration.[1]

Fortunately, the able trial judge has simplified our task. From his thorough analysis of the Harveys' motion for judgment n.o.v., it is obvious that, had that motion been denied, he would have granted the motion for a new trial on this issue. After all, as discussed above, the analysis he applied was actually that mandated by *Quick* for ruling on a motion for a new trial. Therefore, we reverse and remand for a new trial on the issue raised by Instruction No. 17, *supra*, at p. 414, 767 P.2d at p. 257.

### III.

Issue No. 3 is related to the manner in which the trial court dealt with Instruction No. 18, reproduced below:

> Question No. 4: Did the acts of Charles MacGuinnis in driving to the Double Eagle Tavern and while at the tavern just before the collision between the truck and trailer he was operating and the automobile in which plaintiffs were riding serve any business interest of F–B Truck Line Company? R., p. 162.

Because of the jury's negative response to Question No. 3, it did not reach Question No. 4.

However, the trial judge felt that he had the power under I.R.C.P. 49(a) to rule on the omitted finding. R., p. 208. The court felt that the evidence compelled a negative answer since it was uncontradicted that MacGuinnis' trip to Spokane had been cancelled. *Id.* MacGuinnis was on a short detour to the Double Eagle Tavern when the accident occurred.

Notwithstanding a negative answer to Question No. 4, the court concluded that liability still attached to F–B, by operation of law, through the applicable I.C.C. regulations and the overwhelming majority of cases interpreting those regulations. We have no choice but to agree.

F–B points essentially to a single case which held that, under Ohio law, liability of an owner of a motor vehicle for the acts of his employee is governed by the principle of *respondeat superior*:

> In our opinion, the I.C.C. Regulations do not impose a liability on a carrier using leased equipment greater than that when operating its own equipment. *Wilcox v. Transamerican Freight Lines, Inc.*, 371 F.2d 403, 404 (6th Cir.1967). *See also Pace v. Southern Express Co.*, 409 F.2d 331 (7th Cir.1969); *Gudgel v. Southern Shippers, Inc.*, 387 F.2d 723 (7th Cir. 1967).

But the crushing weight of authority is to the contrary. A recent state court opinion has gathered the cases that stand for the proposition that so long as the I.C.C. permit holder allows an operator to use its authority, it is responsible for injuries caused thereby even if the lessor is embarked on an undertaking of his own while using the authority:

> *Transamerican Freight Lines, Inc. v. Brada Miller Freight Sys., Inc.*, 423 U.S. 28, 96 S.Ct. 229, 46 L.Ed.2d 169, (1975); *Rodriguez v. Ager* (10th Cir.1983), 705 F.2d 1229; *Carolina Casualty Ins. Co. v. Insurance Co. of N. Am.* (3rd Cir. 1979), 595 F.2d 128; *Wellman v. Liberty*

---

1. The problem of remanding back to a new or different judge is discussed in *Nafus v. Camp-*

*bell*, 96 Idaho 366, 529 P.2d 266 (1974), and *Van Camp v. Emery*, 13 Idaho 202, 89 P. 752 (1907).

*Mut. Ins. Co.* (8th Cir.1974), 496 F.2d 131; *Poctor v. Colonial Refrigerated Transp., Inc.* (4th Cir.1974), 494 F.2d 89; *Simmons v. King,* (5th Cir.1973), 478 F.2d 857; *Mellon Nat'l. Bank & Trust Co. v. Sophie Lines, Inc.* (3rd Cir.1961), 289 F.2d 473; *Riddle v. Trans-Cold Express, Inc.* (S.D.Ill 1982), 530 F.Supp. 18-6; *Mustang Transp. Co. v. Ryder Truck Lines, Inc.* (E.D.Pa.1981), 523 F.Supp. 1097, *aff'd* (3rd Cir.1982), 688 F.2d 823, *cert. denied,* (1983), 459 U.S. 1127, 103 S.Ct. 763, 74 L.Ed.2d 978; *Cosmopolitan Mut. Ins. Co. v. White* (D.Del.1972), 336 F.Supp. 92; *Hodges v. Johnson* (W.D.Va. 1943), 52 F.Supp. 488; *Kreider Truck Serv., Inc. v. Augustine* (1979), 76 Ill.2d 535, 31 Ill.Dec. 802, 394 N.E.2d 1179; *Cox v. Bond Trans., Inc.* (1969), 53 N.J. 186, 249 A.2d 579, *cert. denied* (1969), 395 U.S. 935, 89 S.Ct. 1999, 23 L.Ed.2d 450. *Cited in Rediehs Express, Inc. v. Maple,* 491 N.E.2d 1006, 109–10 (Ind. App. 3rd Dist.1986); *see also Aetna Casualty & Surety Co. v. Fairchild,* 620 F.Supp. 1245 (D.C.Idaho, 1985); *Price v. Westmoreland,* 727 F.2d 494 (5th Cir. 1984); *Schedler v. Rowley Interstate Transportation Co., Inc.,* [68 Ill.2d 7, 11 Ill.Dec. 541] 368 N.E.2d 1287 (Ill.1977).

Not only are sheer numbers against F–B, but the quality and reasoning of the cases disfavor them as well. *Wilcox, supra,* is a two-page *per curiam* opinion that starts and ends with the assertion that the ICC regulations create no liability broader than the common law. The case contains no federal pre-emption analysis, no examination of the regulations themselves, and no discussion of the rationale and policy considerations behind the ICC regulations.

In contrast, the cases relied upon by the trial judge in this case, *Rodriquez, supra; Simmons, supra; Schedler, supra; Price, supra;* and *Cox, supra,* contain all of the above features missing from the unimpressive *Wilcox* opinion. A lengthy quotation from one of them should be sufficient to demonstrate why we find these cases persuasive and applicable to the facts before us:

> There is no dispute about the nature of the project that Ager was pursuing at

the time of the accident. We have mentioned that it was not on behalf of Sammons; rather it was all arranged by John's brother, David, who was then the owner of the truck and hence it cannot be said that John was driving the truck as an agent of Sammons. If this liability exists at all it is by virtue of a regulation of the ICC. This is what has been referred to as Section 1057.4 of the Code of Federal Regulations. It was promulgated by the ICC some years ago and apparently the promulgation was to correct a problem which existed at the time with respect to regulation of leasing in interstate transportation by truck. For example, one of the provisions of the regulations is that when possession of the equipment is taken by the authorized carrier or the regular employer or agent to do the authorized act for it, said carrier, employee or agent shall give to the owner of the equipment, or the owner's employee, a receipt specifically identifying the equipment and stating the date and the time of day possession thereof is taken. Likewise when the possession by the authorized carrier ends, it or its agent or employee shall obtain from the owner of the equipment, or its regular employee or agent duly authorized to act for it, a receipt specifically identifying the equipment and stating therein the date and time of day possession thereof is taken. Another section which is subsection (d)(1) provides for identification being removed. It provides as follows:

> (1) *Identification to be removed when lease terminated.* The authorized carrier operating equipment under this part shall remove any legend, showing it as the operating carrier, displayed on such equipment, and shall remove any removable device showing it as the operating carrier, before relinquishing possession of the equipment.

There is one other provision which is of particular importance in this case and that is 49 C.F.R. § 1057.4(a)4 which provides:

> *Exclusive possession and responsibilities.* Shall provide for the exclusive

possession, control, and use of the equipment, and for the complete assumption of responsibility in respect thereto, by the lessee for the duration of said contract, lease or other arrangement.

In this case the jury found and concluded that the lease remained in effect at the time of the accident. Notwithstanding that the trial court held that the trucking company could be held responsible only if respondeat superior or vicarious liability, strictly speaking, was present and the jury was so instructed. The main question which we consider is whether as a matter of law this ruling was wrong under the regulations. Does the regulation provide that Section .4(a)(4 result in the lessee of the equipment being absolutely responsible as argued by the appellant. Appellant's position is that the lessee completely assumes responsibility for the equipment and assumes also responsibility for injuries inflicted. Inasmuch as the lease was still in effect the trucking company, it is contended, is responsible until such time as the lease was terminated and after the removal of the insignia of Sammons Trucking Company and delivery of the insignia into the hands of Sammons Trucking Company. At the time of the collision that produced the deaths the Sammons insignia, the authority to drive the truck on the highways, remained on the truck.

Appellants rely completely on the ICC regulations which impose responsibility on the lessee of the truck. These regulations are said to have been promulgated in order to establish responsibility for protection of the public in the lessee of the equipment. The initial important provision is that which requires (1) surrender of the insignia of the lessee and the delivery of a receipt from the owner-lessor showing that the lessor is retaking exclusive possession of the leased equipment and (2) removal from the vehicle of any legend showing that the lessee is the operating carrier that is displayed on the equipment and removal of any other device showing it as the carrier before re-turning possession of the vehicle to the owner. So, it is argued that Sammons is the lessee if these things have not been carried out and in this instance they have not been.

The House Committee which considered the bills seeking to regulate the lessor-lessee relationship issued a report entitled House Report No. 2425. Among other things, it comments on the necessity for regulation of practices connected with leasing and says that the findings made by the Commission on the basis of which its order was issued, indicate the regulations necessary to deal with practices growing out of the use of leased vehicles by authorized motor carriers, which tend in certain respects to prevent the effective carrying out of certain of the provisions of the Interstate Commerce Act.

*The Committee found that in many instances when authorized carriers do lease vehicles owned by others, the safety requirements imposed under Part II of the Act are not observed; that the practice of leasing makes it difficult to fix carrier responsibility; and that some of the arrangements made between authorized carriers and the owners of trip leased vehicles tend to hamper normal rate regulation and otherwise have an adverse effect on the economics and stability of the motor carrier industry. Rodriguez, supra,* 705 F.2d at 1231–32 (emphasis added).

MacGuinnis received F–B placards with the company's ICC permit number, to be displayed on the vehicle. He also received the F–B trip lease and F–B bingo/cab card. He did not place the placards on the truck because he was in a hurry to begin his trip to Spokane. At the time of the accident, these documents were in the truck. Nobody on behalf of F–B retrieved the placards pursuant to the ICC regulations. In short, F–B failed to terminate the lease in the manner required by the regulations. Judge Durtschi's analysis was sound on this issue and we affirm his ruling.

F–B argues that, if we accept their theory of a double-switching of the trailers

discussed above at pages 5–7, there was no lease covering the equipment involved in the accident here and, therefore, no liability of F–B under the ICC regulations. This argument is misplaced. Even accepting the double-switching theory, which Judge Durtschi found to be incredible, the facts before us establish that a lease was entered into *and not terminated* prior to the accident. In addition, the double-switch, if it did in fact occur, is precisely the type of liability-avoidance abuse which the regulations were designed to correct by fixing absolute liability upon the regulated and licensed carrier.

For the foregoing reasons, we reverse and remand for a new trial on Issue No. 2. We affirm the trial court on issues 1 and 3. No costs or attorney's fees awarded.

DONALDSON and HUNTLEY, JJ., concur.

BAKES, J., concurs in the result.

SHEPARD, Chief Justice, concurring and dissenting.

I concur in the opinion of the majority except that part which finds error in the trial court's granting a judgment n.o.v., and thus remands for a new trial.

The majority opinion holds that its decision reversing the trial court's granting of a judgment n.o.v. is compelled by *Quick v. Crane*, 111 Idaho 759, 727 P.2d 1187 (1986). I disagree. Although the majority accurately characterizes the facts and the trial judge's reasons for his ruling, the majority in my view, misinterprets the standard to be applied by a trial judge when ruling upon a motion for a judgment n.o.v. The majority opinion correctly quotes *Quick* as authority for the trial court's lack of discretion and the inability of the trial judge to weigh the evidence and the credibility of the witnesses upon a motion for a judgment n.o.v. However, I disagree with the majority that the trial court did that which *Quick* forbids, *i.e.*, weighing the evidence and the credibility of the witnesses.

In my opinion, *Mann v. Safeway Stores Inc.*, 95 Idaho 732, 518 P.2d 1194 (1974) is the seminal case regarding the duties of a trial court when faced with a motion for a judgment n.o.v. In *Mann*, the Court, per Donaldson, J., reviewed the different tests found in earlier opinions of the Court, and "... concluded that the proper test ... is, a motion for judgment n.o.v. should not be granted when there is substantial competent evidence to support the verdict of the jury." The Court in *Mann*, 95 Idaho at 736, 518 P.2d at 1198, continued:

By substantial, it is not meant that the evidence need be uncontradicted. All that is required is that the evidence be of such sufficient quantity and probative value that reasonable minds could conclude that the verdict of the jury was proper. It is not necessary that the evidence be of such quantity or quality that reasonable minds must conclude, only that they could conclude. Therefore, if the evidence is so weak that reasonable minds could not reach the same conclusion the jury has, the motion for judgment n.o.v. is properly granted.

*Mann* has been approved, followed and applied in *Hibbler v. Fisher*, 109 Idaho 1007, 712 P.2d 708 (Ct.App.1985); *Brand S Corporation v. King*, 102 Idaho 731, 639 P.2d 429 (1981); and *Smith v. Great Basin Grain Co.*, 98 Idaho 266, 561 P.2d 1299 (1977). Indeed, in *Quick*, 111 Idaho at 764, 727 P.2d at 1192, the Court stated that the trial judge is not free to weigh the evidence or pass on the credibility of witnesses and make his own separate findings of fact to be compared to the jury's findings:

Rather, the trial judge must view all of the evidence and all inference drawn therefrom in favor of the non-moving party and decide if there was substantial evidence to justify submitting the case to the jury, or, in other words, that there can be but one conclusion as to the verdict that reasonable minds could have reached. (Citations omitted). Thus, the function of I.R.C.P. 50(b) is to give the trial court the last opportunity to order the judgment that the law requires.

Turning to the instant case, it is my view that the majority has misapprehended the actions of the trial court in ruling on the motion for the judgment n.o.v. I do not

agree that the trial court has either weighed the evidence or the credibility of the witnesses. I view the trial court's mention of the credibility of MacGuinnis as merely a casual aside. As stated by the trial court, and also by the majority opinion, there was no direct evidence that MacGuinnis switched trailers. As indicated, MacGuinnis testified as to his actions from the time he picked up the Montgomery trailer until the time of the accident, and no switching of trailers was indicated in that testimony. Hence, the argument that the trailers were switched rests on no evidence, substantial or otherwise, but rather only on an inference which arises from the testimony of two witnesses, each identifying the trailer as being of a different manufacturer. Judge Durtschi identified that inference as resting on "the slender thread of an uncorroborated assumption," and "pure speculation as to the circumstances and reason for the switching." As correctly quoted by the majority, Judge Durtschi stated:

> The record is totally silent as to why the supposed two switches were made, when they were made, where they were made, or where the phantom trailmobile trailer came from or what happened to it. It seemingly appeared at the Stinker Station from nowhere and thereafter disappeared, never to be seen again sofar as this trial record is concerned.

The trial judge then stated: "Hence, I conclude that the jury's finding in answer to question no. 3 is not supported by substantial evidence and is in fact contrary to the great weight of the evidence."

Hence, I would hold that the trial judge utilized the correct standard in ruling upon the motion for judgment n.o.v., *i.e.*, that the jury's finding was not supported by substantial evidence as set forth in *Mann v. Safeway, supra*, and its progeny. I would affirm the trial judge's order granting the judgment n.o.v., and hence there is no necessity for a remand for a new trial.

BISTLINE, Justice, on denial of petition for rehearing.

█ On filing and consideration of the respondent's petition for rehearing and the brief filed in support thereof, the Court requested and received a responsive brief from appellant. Having now given the issues decided in the Court's opinion of July 16, 1987, full reconsideration, and deeming that oral reargument is not required, the Court is persuaded to the views of Chief Justice Shepard as expressed in his dissent. Those views are adopted in place of Part II of the July opinion and the decision of the Court is hereby modified to that extent.

Accordingly the judgment of the trial court is affirmed in its entirety. Costs are awarded to respondents.

We affirm the district court in all respects.

SHEPARD, C.J., and HUNTLEY, J., concur.

DONALDSON, J., did not participate in this opinion on rehearing, due to his untimely death.

BAKES, Justice, dissenting, on denial of petition for rehearing:

The Court's action today is truly unusual and unprecedented. On July 16, 1987, we issued an opinion affirming in part and reversing in part and remanding for a new trial in this matter. On August 5, 1987, the respondent Harvey, *et al.*, petitioned for rehearing and, on August 19, 1987, filed a brief in support thereof. On November 12, 1987, the appellant F–B Truck Line filed a brief in response to the petition for rehearing and on November 27, 1987, the respondent filed a reply brief to that brief.

At that time if the Court determined that its prior opinion was incorrect, the appropriate procedure was to grant the petition for rehearing and set the matter down for reargument so that the parties could specifically address the issues which divided the Court in our original opinion. However, the Court today, without citing any authority or rule to support its action, takes the unprecedented step of denying the petition for rehearing, but issuing a new opinion in which it reverses itself and adopts the "views of Chief Justice Shepard as expressed in his dissent." Because this new

**422**

"opinion" is as erroneous as it is unprecedented, I dissent.

In keeping with its unusual procedure, and no doubt to the confusion of the litigants and the bar, the Court leaves its original opinion in place, together with the earlier dissenting opinion of Chief Justice Shepard. A brief summary of the Court's earlier opinion is necessary to understand the egregious error which it commits today. This was an action by Leonard Harvey, *et al.*, against F–B Truck Line resulting from an automobile accident in which the plaintiffs collided with a truck and trailer operated by one Charles MacGuinnis which was parked at a bar near Eagle, Idaho, with the trailer extending partially into the road right-of-way. The plaintiffs claim of liability against F–B Truck Line was based on two grounds: (1) that F–B was liable for MacGuinnis's negligence under the common law doctrine of *respondeat superior*, and (2) that F–B Truck Line was liable as a statutory employer under the regulations of the Interstate Commerce Commission (49 CFR 1057, 1058). The plaintiffs alleged that MacGuinnis, who had borrowed or rented the truck and trailer from two other persons, had trip-leased the equipment to F–B Truck Line in order to haul a load of lumber from Spokane, Washington, to Arizona. Trip-leasing was a method apparently approved by the Interstate Commerce Commission whereby a truck line with authority from the ICC to transport products from Spokane to Arizona would lease the equipment owned and operated by another, thereby permitting that person to come under the ICC authority of F–B Truck Line so that the owner-operator (MacGuinnis) could haul the merchandise from Spokane, Washington, to Phoenix, Arizona, and be compensated therefor. The testimony reflected that MacGuinnis, in order to perform this hauling from Spokane to Arizona, had borrowed or rented the tractor owned by Tom Hanson, and on the day in question had also arranged to borrow a 1966 "Beale" trailer from Ray Montgomery. MacGuinnis testified that he made the arrangements with Montgomery at about noon on the day in question and that he took the

tractor-trailer unit to the Stinker Station in Caldwell where F–B Truck Line had an agent who arranged trip-leases, and there he executed a trip-lease of the truck and trailer to F–B Truck Line so that he would have ICC authority to transport the load of freight from Spokane, Washington, to Arizona. However, later that afternoon, the order for the load to be shipped from Spokane to Arizona was cancelled, and MacGuinnis was returning the truck and trailer to Hanson's place when he decided to stop at the Double Eagle Tavern near Eagle, Idaho. While MacGuinnis was stopped at the tavern, the plaintiffs collided with the trailer, which was extended into the highway, causing the injuries for which plaintiffs filed this action.

As this Court's original July 16, 1987, opinion accurately points out, the trial court, in a pretrial summary judgment motion, "determined that F–B could not be held liable under the common law doctrine of *respondeat superior*," because at the time of MacGuinnis's side trip to the Double Eagle Tavern he was not serving any business interest of F–B Truck Line Company. The trial court expressly found that "the evidence is uncontradicted that MacGuinnis's contemplated trip to Spokane was aborted because he was advised en route that the load had been cancelled." MacGuinnis was returning the truck to Hanson's place (the person from whom he borrowed the tractor) when the trial court found that he took a "short detour to the Double Eagle Tavern where the accident occurred." The trial court expressly found that MacGuinnis's side trip to the Double Eagle Tavern did not serve any business interest of F–B Truck Line Co., and therefore there was no *respondeat superior* liability. Thus, the sole basis for any claim of liability on the part of F–B was pursuant to the trip-lease and the ICC regulations.

It was the plaintiffs' burden to prove that the trailer involved in the accident had been trip-leased to F–B Truck Line in order to hold F–B Truck Line responsible. The trial court relied on the ICC regulation (49 CFR 1057.12(c)) which provided that the lessee (F–B Truck Line) in such a trip-lease

remained liable for a period of 30 days after execution of the lease. However, as the district court had ruled early on in the case, under 49 CFR 1057.2(b), the truck and trailer had to be treated as a unit at all times, and if the trailer which had been leased had been removed and another trailer attached to the tractor, it would not constitute the "equipment" within the meaning of the federal regulations, and thus no 30-day liability would attach. Any other combination of equipment would not have been the "leased equipment" referred to in the ICC regulations. Furthermore, the district judge also made the practical conclusion that "it was obvious that F–B could not haul its load of freight from Spokane to Phoenix with a tractor alone, and whatever acquisition of equipment was made on behalf of F–B on March 28, 1980, was a tractor and a trailer as a unit." Therefore, as the trial court acknowledged, plaintiffs had the burden of proving that the trailer involved in the accident was in fact the trailer which had been leased to F–B Truck Line by Barnes at 3:00 p.m. at the Stinker Station.

However, the trip-lease which was negotiated and signed by MacGuinnis and by James Barnes for F–B Truck Line, was not for Montgomery's 1966 Beale trailer which was involved in the accident, but was for a 1977 Trailmobile. The evidence in the record contains the testimony of both Barnes and MacGuinnis, describing how they negotiated and executed the trip-lease, Plaintiff's Exhibit 13. The trip-lease was signed by both Barnes and MacGuinnis, and describes the trailer as a 1977 Trailmobile. In addition, the trip-lease required a safety inspection to be made on both the tractor and the trailer, with eighteen specific items to be inspected on the tractor, and eight items to be inspected on the trailer, such as the trailer brakes, tires, lights, etc., before the trip-lease was accepted by F–B Truck Line. Both Barnes and MacGuinnis testified that Barnes conducted the inspection on both the tractor and the trailer, and each of the 18 items on

the tractor and the eight items on the trailer were checked by Barnes as approved for safety compliance. When asked where he obtained the information for the description of make and model of the tractor and trailer, Barnes stated, "Most likely from the registration or the lease from the leasing company."

In view of the direct testimony of both Barnes and MacGuinnis concerning the procedure in inspecting and trip-leasing the truck and trailer, and the trip-lease itself, signed by both Barnes and MacGuinnis, which describes a 1977 Trailmobile trailer, rather than the 1966 Beale trailer involved in the accident, the plaintiffs had the rather large burden of proof at trial to convince a jury that Barnes's testimony, and the trip-lease, Exhibit 13, were incorrect and that the trailer which had been presented at the Stinker Station at 3:00 p.m. on the day in question was in fact the 1966 Beale trailer which was involved in the accident, as MacGuinnis testified at trial. To attempt to meet that burden the plaintiffs called as a witness Ray Montgomery, the owner of the 1966 Beale trailer. He testified that on the same day as the accident he rented the 1966 Beale trailer that was involved in the accident to MacGuinnis for a week. Prior to that time he had not known MacGuinnis. He testified that MacGuinnis came to his shop shortly after noon to make the arrangements for the lease. However, nowhere in his brief testimony does he describe where the trailer was actually located, or when MacGuinnis actually picked it up.

This was a classical case of a jury having to determine the credibility of witnesses. The jury had to decide whether to believe MacGuinnis, or whether to believe Barnes and the trip-lease, Exhibit 13. The trial court recognized this, stating, "I am cognizant of the fact that impeachment evidence was introduced as to both James Barnes and Charles MacGuinnis. Therefore, the jury could have elected to disbelieve either or both of those witnesses...."[1] The

---

1. It was established at trial that MacGuinnis had felony convictions for fraudulent checks. His pretrial deposition, taken shortly before trial, was conducted at the Idaho State Penitentiary where he was incarcerated on three check charges.

424

court then acknowledged that "the jury to a large extent found the testimony of James Barnes to be credible." The jury specifically found in favor of Barnes and F–B Truck Line in answering Special Interrogatory Question No. 3 in which the jury found that James Barnes had not acquired the use of the truck and trailer operated by Charles MacGuinnis at the time of the accident for F–B Truck Line. [The jury's special verdict is attached as an appendix.] As this Court's original opinion of July 16, 1987, points out, the jury in response to Questions 1 and 2 had found that James Barnes was the agent for F–B Truck Line and did have authority to acquire equipment under lease from another to transport property under F–B's ICC permit. Thus, the jury, by finding that Barnes had authority to trip-lease, but had not "acquire[d] the use for F–B Truck Line ... of the truck and trailer operated by Charles MacGuinnis at the time of the accident," resolved the credibility issue against MacGuinnis and in favor of Barnes, as the trial court acknowledged.

Our earlier July 16, 1987, opinion pointed out how the trial court misconstrued the standard for ruling upon a motion for judgment notwithstanding the verdict. As we stated in that opinion, the trial court was "without the benefit of our most recent thinking on the subject[, s]ee *Quick v. Crane*, 111 Idaho 759, 727 P.2d 1187 (1986), [and] did precisely that which Quick forbids; he weighed the evidence and the credibility of the witnesses." Even though the trial court recognized "that the jury may have had legitimate questions about the general level of credibility of MacGuinnis' testimony," and that "the jury to a large extent found the testimony of James Barnes to be credible," the trial court nevertheless proceeded to draw its own inferences from the evidence, and also proceeded with an analysis which effectively shifted the burden of proof to the defendant. The trial court stated:

"The evidence is ... uncontradicted that the lease transaction between Barnes and MacGuinnis took place later that day at around 3:00 p.m. at the Stinker Station. This is the time that Barnes identi-

fied the trailer as a 1977 Trailmobile on Exhibit 13. If the trailer MacGuinnis presented at the Stinker Station was not the Montgomery trailer, the conclusion is inescapable that MacGuinnis had switched trailers between noon when he picked up Montgomery's trailer, and 3:00 p.m. on March 28, 1980, when he appeared at the Stinker Station. The evidence is also uncontradicted that at approximately 7:30 p.m. of that same day, when the accident occurred, MacGuinnis again had Montgomery's trailer. If this was not the same trailer presented at the Stinker Station, the further conclusion is inescapable that MacGuinnis had again switched trailers between 3:00 p.m. and 7:30 p.m. by dropping the trailer he presented at the Stinker Station and again picking up the Montgomery trailer. The record is totally silent as to why the supposed two switches were made, when they were made, where they were made, or where the phantom Trailmobile trailer came from or what happened to it. It seemingly appeared at the Stinker Station from nowhere and thereafter disappeared, never to be seen again so far as this trial record is concerned."

Concluding that "the different descriptions of the trailer by Barnes and Montgomery did not, standing alone, compel the conclusion that different trailers were involved and that MacGuinnis would have needed a motive and a means of accomplishing the 'double-switch,'" the trial court made its own finding that:

"MacGuinnis traced his actions from the time he picked up the Montgomery trailer to the time of the accident and no switching of trailers was involved in that testimony. Even recognizing that the jury may have had legitimate questions about the general level of credibility of MacGuinnis' testimony, there is nothing in the record to suggest any motive to switch trailers or to fabricate this part of his testimony.

"From the evidence just summarized it is clear that the conclusion that MacGuinnis switched trailers twice between noon and 7:30 p.m. on the day of the accident must

rest on the slender thread of an uncorroborated assumption that a means of accurate identification of the make of trailer was available to both Barnes and Montgomery and that each had the ability by that means to identify accurately the make of the trailer, plus pure speculation as to the circumstances and reason for the switching. *A finding much more consistent with the total evidentiary record is that Barnes was simply mistaken in his identification of the make of the trailer.* Hence, I conclude that the jury's finding in answer to Question No. 3 is not supported by substantial evidence and in fact is contrary to the great weight of the evidence. I find that the great weight of the evidence supports an affirmative answer to Question No. 3." (Emphasis added.)

While a motive for switching the trailers was fairly apparent, *i.e.*, the Montgomery 1966 Beale trailer might not have met the 8–point safety check required for an F–B Truck Line trip-lease, whereas the 1977 Trailmobile would have, it was not the defendant's burden to prove either a motive for the switching of the trailers or the fact that the trailers were switched at all. It was the plaintiffs' burden to prove that the 1977 Trailmobile trailer which Barnes testified he trip-leased, and which Exhibit 13 showed was trip-leased, was in fact the same trailer as the 1966 Beale trailer which was involved in the accident. The jury apparently had the same doubts about the credibility of MacGuinnis as did the trial court who stated "that the jury may have had legitimate questions about the general level of credibility of MacGuinnis' testimony...." MacGuinnis had, after all, furnished whatever documents that Barnes used in making out the trip-lease, Exhibit 13, and had signed the lease, describing the trailer as a 1977 Trailmobile. His later testimony conflicts with his earlier action in signing the lease. The jury resolved that credibility dispute in favor of Barnes and against MacGuinnis.

Nevertheless, the trial court invaded the jury's factfinding function by concluding that "a *finding much more consistent with the total evidentiary record is that Barnes*

*was simply mistaken in his identification of the make of the trailer.*" However, both Barnes and MacGuinnis would have had to be mistaken at that time, not just Barnes. They both negotiated and signed the lease. In any event, as our earlier opinion pointed out, in so finding the trial court "did precisely that which *Quick* forbids; he weighed the evidence and the credibility of the witnesses." *Ante* at 416, 767 P.2d at 259.

The Court today, in this unprecedented proceeding, erroneously adopts the conclusion of the dissenting opinion to our original opinion issued July 16, 1987, which concluded that "there [being] no direct evidence that MacGuinnis switched trailers," the jury's verdict rests on "'the slender thread of an uncorroborated assumption,'" and is "not supported by substantial evidence as set forth in *Mann v. Safeway, supra,* and its progeny." *Ante* at 421, 767 P.2d at 264. However, to reiterate, it was not the defendant's burden to prove that the trailers were switched, or to prove a motive for the switching. Rather, the plaintiffs had the burden to prove that the trailer involved in the accident was the same trailer presented for trip-leasing at 3:00 p.m. the afternoon of the accident. The eye witness testimony of James Barnes who leased the trailer from MacGuinnis, and the trip-lease, Exhibit 13, which was signed by both Barnes and MacGuinnis and which describes the trailer inspected and trip-leased as a 1977 Trailmobile, was substantial evidence to support the jury's finding that the trailer involved in the accident had not been trip-leased to F–B Truck Line.

Today the Court holds that the testimony of a credible eye witness, together with a written trip-lease signed by *both* that witness and the prime witness for the plaintiffs, MacGuinnis, describing the trailer inspected and trip-leased by F–B Truck Line as a 1977 Trailmobile, is not sufficient evidence to support a jury verdict that F–B had not leased the 1966 Beale trailer involved in the accident. As the result of today's decision, the right to trial by jury, which has been only recently described by this Court as "an extremely valuable one guarded jealously by this Court," *Akers v.*

*Koubourlis*, 115 Idaho 889, 771 P.2d 907, (1988) has been stripped of much of its meaning.

## APPENDIX

In the District Court of the Fourth Judicial District of the State of Idaho, In and For the County of Ada

Case No. 72599

Filed Feb. 7, 1985

Leonard Harvey, et ux. & Donald Wells, et ux., Plaintiffs,

v.

Charles MacGuinnis & F-B Truck Line Company, Defendants.

### SPECIAL VERDICT

We, the jury, answer the questions submitted to us in the special verdict as follows:

QUESTION NO. 1: Was James Barnes an agent of F-B Truck Line Company on March 28, 1980?

ANSWER    YES X    NO___

If you answered Question No. 1 "yes", then answer Question No. 2.

QUESTION NO. 2: Was it within the scope of James Barnes' authority as an agent of F-B Truck Line Company to acquire the use of motor transportation equipment owned by another to transport property under F-B's I.C.C. permit and to engage the person from whom the equipment was acquired to operate such equipment for F-B?

ANSWER    YES X    NO___

If you answered Question No. 2 "yes", then answer Question No. 3.

QUESTION NO. 3: Did James Barnes before the accident on March 28, 1980, acquire the use, for F-B Truck Line Company in transporting property under F-B's I.C.C. permit, of the truck and trailer operated by Charles MacGuinnis at the time of the accident and engage Charles MacGuinnis to operate such equipment for F-B?

ANSWER    YES___    NO X

If you answered Question No. 3 "yes", then answer Question No. 4.

QUESTION NO. 4: Did the acts of Charles MacGuinnis, in driving to the Double Eagle Tavern and while at the tavern just before the collision between the truck and trailer he was operating and the automobile in which plaintiffs were riding, serve any business interest of F-B Truck Line Company?

ANSWER    YES___    NO___

DATED This 7th day of February 1985.

_____
Foreman

## ON REHEARING

BISTLINE, Justice.

On June 9, 1988, in ruling on the plaintiffs' petition for rehearing the Court modified its initial opinion of July 16, 1987, by issuing an opinion whereby the 1987 dissenting views of Justice Shepard were adopted in place of Part II of the July 1987 opinion of the Court.

Subsequently the defendant F–B Truck Line Company petitioned for a rehearing, which was granted. We received briefs of the parties and have now had the benefit of oral argument. Being fully advised, the Court adheres to the initial opinion as modified by the Court's opinion of June 9, 1988. We add thereto only that on one of the main issues argued, i.e., the authority of the trial court to award the grant of a judgment n.o.v. to a plaintiff, we see no reason to depart from *Brand S Corp. v. King*, 102 Idaho 731, 639 P.2d 429 (1981).

SHEPARD, C.J., and HUNTLEY, J., concur.

BAKES, Justice, dissenting:

I continue to adhere to my earlier dissent in this matter. See supra at 421, 767 P.2d at 264 (Bakes, J., dissenting on denial of petition for rehearing). I write today only to point out the error in the majority's claim that *Brand S Corp. v. King*, 102 Idaho 731, 639 P.2d 429 (1981), supports its action in this case.

The instant case and *Brand S Corp.* are clearly different. In fact, they are at opposite ends of the spectrum. Although both cases involve the granting of a j.n.o.v., in the instant case j.n.o.v. was granted *in favor of* the party who had the burden of proof, even though the evidence offered by plaintiff to carry that burden was rejected by the jury. Conversely, in *Brand S Corp.* j.n.o.v. was granted *against* the party with the burden of proof because insufficient evidence was presented to support its affirmative defenses. The Court held that the party had *failed* to carry its burden of proof.

Here, in order to hold F–B Truck Line responsible for the accident under the ICC regulations, the plaintiffs had the burden of proving that the trailer involved in the accident had been trip-leased to F–B Truck Line. Plaintiffs attempted to meet their burden by introducing the testimony of the driver, MacGuinnis. However, as the trial court acknowledged, the jury found the testimony of MacGuinnis not to be credible. Furthermore, the jury apparently chose to believe the testimony of F–B Truck Line's witness, Barnes, who testified that the trailer he trip-leased was different than the trailer involved in the accident. Notwithstanding the jury's factfinding in this regard, the trial court nevertheless granted j.n.o.v. for the plaintiffs—the party who had the burden of proof and who the jury found failed to carry it.

In *Brand S Corp.*, however, the j.n.o.v. was granted *against* the party who had the burden of proof. It is one thing to grant a j.n.o.v. against a person because he has not met his burden of proof. It is an entirely different matter, though, to grant a j.n.o.v. *in favor of* the person with the burden of proof when the jury has found that person's witnesses were not credible. If the jury is the exclusive judge of credibility and the ultimate finder of fact, as they were instructed here, then how can a trial judge grant a j.n.o.v. in favor of a person having the burden of proof where the jury has rejected his evidence as not credible, as they did in this case?[1]

Plaintiffs Harvey and Wells had the burden of proof. The jury found plaintiffs' evidence to be impeached and not credible,

---

1. In the very first instruction he gave, the trial judge formally charged the jury to find the facts and judge the credibility of witnesses. In pertinent part, Instruction No. 1, which was a composite of IDJI Instructions 100, 110 and 111, reads:

   "It is your duty to determine the facts. . . .
   . . . .
   "You are the sole judges of the credibility of the witnesses and of the weight to be given to the testimony of each of them. In determining the credit to be given any witness you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias or prejudice he

   may have, and the reasonableness of his testimony considered in the light of all the evidence in the case."

   However, by granting the j.n.o.v. in favor of the plaintiffs, after acknowledging that "the jury could have elected to believe either or both of those witnesses (MacGuinnis or Barnes)," and after concluding that "the jury to a large extent found the testimony of James Barnes to be credible," the trial court usurped the jury's authority and responsibility as "the sole judges of the credibility of the witnesses and of the weight to be given to the testimony of each of them." Instruction No. 1.

while the testimony of the defense witness was credible. Under those circumstances the j.n.o.v. in favor of plaintiffs should never have been granted.

The *Brand S Corp.* case does not support the majority's result because *Brand S. Corp.* involved the granting of a j.n.o.v. *against* a party which failed to meet its burden of proof. The instant case, however, involves the granting of a j.n.o.v. *in favor of* a party who the jury found had failed to meet its burden of proof. They are not the same thing as the majority mistakenly holds. Accordingly, I dissent from the majority's opinion which attempts to sustain its result based upon the *Brand S Corp.* case.

JOHNSON, J., concurs.